THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* WILFREDO HERNÁNDEZ SANTIAGO, Defendant and Appellant.

No. CR-68-179. Decided June 27, 1969.

510

*Yamil Galib Frangie* and *Luis E. Negrón Lizardi* for appellant.
*J. F. Rodríguez Rivera, Acting Solicitor General,* and *Américo Serra, Assistant Solicitor General,* for The People.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Appellant, Wilfredo Hernández Santiago, was accused and convicted of murder in the first degree. On January 5, 1967 he was sentenced to life imprisonment.

The 14 errors assigned by appellant are based on (1) the prosecuting attorney's improper conduct; (2) the failure to admit the recording made by the defense of the testimony rendered by witnesses at the preliminary hearing; (3) the admission of evidence concerning appellant's former offenses; (4) the denial of a motion to discharge the jury (mistrial); (5) errors in the instructions to the jury; (6) errors of the jury in weighing the evidence; (7) the denial of a new trial; and on (8) the fact that it does not appear from the record that the verdict was accepted by the trial court or that the sentence corresponded to the verdict.

We do not agree, for the reasons set forth hereinafter.

### Summary of the Evidence

The following facts, recited by the Solicitor General, appear supported by the evidence.

"In or about the month of June 1965, in the Ward Bartolo of Lares, defendant had a wrangle with Manuel Soto, father of the victim of the murder, Pablo Soto, in connection with the marking of boundaries which was being performed between Soto's parcel and defendant's property. [On that occasion defendant hit Soto with a machete wounding him on one arm.] About the month of August 1965, there was another controversy, this time between defendant and the victim of the murder, Pablo Soto, the former alleging that the latter had insulted his wife. A trial was held against Pablo Soto in connection with this allegation, the latter being acquitted. Defendant told Pablo Soto, while coming out of the court, that 'it was all right, that he was going to be acquitted, but that he would settle it.' During the first days of the month of September 1965, defendant told witness Eugenio Vélez Lajara that he was going to give Pablo Soto a beating.

"Thursday, September 30, 1965, Pablo Soto left his house at noon to take lunch to his brother Edelmiro Soto. That day Pablo Soto was wearing black rubber boots cut to the ankle. Witness Vélez Lajara saw Soto going towards the paved highway, a few minutes before twelve noon. Several witnesses saw defendant that day climbing alone in a jeep towards the 'Arbona' property at about 12 thirty in the afternoon. Witness Luis Angel Ramos Desardén noticed that defendant carried in the jeep a black bundle, some long sticks, and some black 'parts of boots' cut to the ankle. Another witness for the prosecution, Romualdo Caraballo, noticed that defendant carried an ash or black packsaddle and two sticks inside the jeep. This witness stated that the packsaddle was of the same color as that of the bundle where the victim of the murder was found. Defendant wore a shirt when he went up to the farm at noon. Around two to two thirty in the afternoon he was seen coming down in the jeep with Luis Morales. On this occasion defendant did not have a shirt on. Witness Vélez Lajara noticed that on that day

in the morning defendant wore dirty clothes, and that when he saw him again at two thirty in the afternoon he was clean.

"The following day, Friday, October 1, 1965, Ramón Ramos Desardén was working at the 'Arbona', a property owned by defendant's father. At about two to two thirty in the afternoon he went to get ripe bananas in a footpath, when he noticed that defendant, naked from the waist up, carried a bundle upon his shoulder, and that 'he threw it into a ditch that was there and covered it with pieces of sticks and banana plants.' When defendant left the place, Ramos Desardén, who was hidden, went nearer the place where defendant had hidden the bundle and noticed that there was half of a human being, from the waist to the neck, wrapped and tied in an ash colored packsaddle. After he saw the bundle, the witness covered it and left it as defendant had placed it.

"On Saturday, October 2, 1965, during the morning, defendant ordered several of his employees to weed and fell coffee trees and banana plants near the place where the corpse of Pablo Soto appeared later. Luis Angel Ramos Desardén met defendant and the latter threatened him 'because he had known that I had said that he carried a bundle.' At two o'clock in the afternoon of that day, defendant went, accompanied by his employees, Carlos Vega Ferrer and Luis Morales, to find a tractor (*'puerca'*) or machine to make roads to Tomás Molini's house in the Ward Indiera Alta of Maricao. That same day defendant took the *'puerca'* or tractor to the Arbona property and began to open a path 'in the upper part where the corpse was found.'

"On Sunday, October 3, defendant arrived at the Ward Bartolo 'with dirty clothes on, full of red dirt.' The police, who were already investigating the disappearance of Pablo Soto, since October 1, suspected that defendant was working that Sunday and two policemen went to the Hacienda Arbona. There they found the tractor (*'puerca'*) to make roads and noticed that defendant had made a path one kilometer long that day. The policemen wondered to see that in order to make that path 'they had destroyed a coffee plantation quite beautiful where the coffee was about to ripen.' At a place near where a curve had been cleared, there was a ditch in the lower part and 'they had covered the ditch.' Around five in the afternoon of that day, they found a stinking plastic 'cellophane paper' which was putrid. They placed a piece of wood over it and went to

find a bag to put it in, but when they returned, half an hour later, the paper had disappeared.

"On Tuesday, October 5, the police found several laborers to help to dig. They requested the authorization to dig from Andeliz Hernández, the defendant's father, and he told them that they could dig there, that there were no problems. That day they dug until five in the afternoon. Defendant arrived there that day and asked them what were they doing there, and told them that if they dig there they had to leave the place as it was before.

"On Wednesday, October 6, in the morning, while the police continued the search, defendant went to the house of Palmira Santiago, the wife of one of the employees of defendant's father, and told her that if the police asked about him to say 'that it had been the Desardenes,' that if the police asked her 'about the crime which had occurred, that Pablo had been killed', to say that 'it had been done by the Desardenes.'

"The police continued the search during the rest of the week, and on Sunday, October 10, they borrowed a mechanical shovel. That Sunday a bundle with a heart and ribs, which stank very much, appeared wrapped in a packsaddle used to carry bananas and tied with a rope. While the police were digging, defendant was blocking the way and 'obliged them to go up.' They were able to go by the path when the loader came up and they requested defendant to open the path to run the machine over that day.

"On Monday, October 11, the police went to the same place in the patrol car, and because of the rain, this vehicle 'went into a ditch that had been formed and skidded and went to the other side and a tremendous stench came out.' They noticed there lots of hair and bones and found a bag which contained a human head and two pieces of arms. The cover of defendant's tractor ('puerca') was near the edge of the path, in the place where they had begun to dig for the first time. Defendant told them 'not to move anything because it was a point he had,' but they moved the cover sideways and the corpse 'appeared in that same direction.'

"At about three or four hectometers from where the corpse appeared, the police found burnt clothes which smelled of gasoline and noticed footsteps of military shoes.

"The dismembered corpse was identified as that of Pablo Soto Acevedo by his brother Edelmiro Soto."

*Analysis and Disposition of the Errors Assigned*

I. Prosecuting attorney's improper conduct.

(a) The defense argues that "Upon delivering his open-ing statement the prosecuting attorney offered to prove the facts with the testimony of Luis Morales Quirós, whose refusal to testify about the same and his hostility were known by the prosecuting attorneys for more than a year, specifically since the holding of the preliminary hearing of the case . . . . This situation is shown more clearly in the discussion we make hereinafter of the second [assignment of error] and which has a bearing on the decision of the trial court allowing the prosecuting attorneys to offer in evidence the statements given to them by said witness in the course of the investigation of the case for the purpose of impeaching said witness." The defense states that the situation contemplated in *People* v. *Fournier*, 80 P.R.R. 376 (1958), and in *People* v. *Díaz*, 74 P.R.R. 348 (1953), is not involved herein, since the prosecuting attorney was not acting in good faith but knowing that he was offering an evidence which he did not have; that the case of *People* v. *Marchand*, 53 P.R.R. 640, 651 (1938) is applicable to that situation.

■ The prosecuting attorney referred, in his opening statement, to the fact that on the day of the events defendant took the witness Luis Morales Quirós near his house and ordered him to weed the edge of the path where the victim went by, and that when Morales Quirós weeded there he found rice and defendant told him that that was the carpenter's lunch which had been spilled. Also, the prosecuting attorney stated that when defendant went up towards the Arbona property he wore a shirt, but that when he reached Luis Morales Quirós he did not have a shirt on. It is correct and it conforms to law for the prosecuting attorney in his

opening statement to refer to evidence which is in his possession in sworn statements given by witnesses during the original investigation of the case. The fact that at a preliminary hearing held more than a year before the trial the witness refused to testify is not any indication that it was known beforehand that he was going to do the same thing at the trial. So much so, that at the hearing of the trial witness Morales Quirós repeated a great part of his original statement, even though he did not remember the aforesaid facts.

■■ After Morales Quirós testified that he did not remember such facts, he was faced with the recital of the same in his sworn statements and he reaffirmed that he did not remember them. The trial court admitted the statements for the sole purpose of impeaching the credibility of the witness and therefor charged the jury warning them that they should not consider the contents of the same as evidence. Such action was not erroneous. *People* v. *Verdejo Meléndez*, 88 P.R.R. 202, 212, 213 (1963).; *People* v. *Zayas*, 72 P.R.R. 17, 20, 21 (1951). The prosecuting attorney acted in good faith since he had in his possession sworn statements of this witness where the latter asserted what the prosecuting attorney expressed in his opening statement. The case of *People* v. *Marchand, supra*, is not applicable because what is stated therein in the matter is that the impeaching evidence is not admissible to help make out a positive case for the People. Note, also, that, on the contrary, in the case at bar the court charged the jury properly about the purpose and scope of the opening statement of the prosecuting attorney stating that said opening statement "does not constitute any evidence and you are the ones who are to determine whether the prosecuting attorney has proved the facts which he stated in his opening statement." *People* v. *Rivera*, 83 P.R.R. 452, 460 (1961); *People* v. *Fournier, supra*.

(b) The defense alleges that the prosecuting attorney

incurred in tumultuous, improper, and violent conduct. The incident on which this assignment is grounded was the following:

■ While Prosecuting Attorney Vera Mercado was examining defendant, the latter said that Prosecuting Attorney Cordero Román had entered his house and that on several occasions he had caressed his six-year-old daughter. Then Prosecuting Attorney Cordero Román stated the following:

"It is a lie! And Your Honor may give me the punishment he wants and can send me to jail or prison if you believe that that is true." (Tr. Ev., 2d piece, p. 440.)

After the judge admonished energetically the prosecuting attorney, he ordered an adjournment on motion of the defense. Defendant requested then the court to order the discharge of the jury (mistrial) but said request was dismissed by the court. When the jury returned to the courtroom, the trial judge charged them immediately that the statements of the prosecuting attorney and of the attorneys of the parties do not constitute any evidence and specifically the former statements of the prosecuting attorney; "You shall judge the case on what the witnesses have said and on the documentary evidence which is offered." On the other hand the prosecuting attorney admitted that he should not have behaved as he did, he apologized to the jury and asked them to efface from their minds, upon deliberating the case, the incident and any impression which it may have caused.

As we stated in *Rivera, supra,* we cannot presume that the jurors are persons of extreme sensibility, that the slightest contact with any incident, in murder or in any other crime which they are judging, might affect them in such a way as to preclude them from rendering an impartial verdict.

■ (c) Appellant complains that the prosecuting attorney called the attention of the jury by irrelevant questions

to the fact that defendant's father, mother, wife, and brother were not present in the courtroom as spectators.

To questions of the prosecuting attorney, witness Juanita Soto, sister of the victim, said that she knew these relatives of defendant but that she did not see them in the courtroom.

Aside from the fact that the defense did not object at any moment to the questions of the prosecuting attorney, we do not see how this incident could prejudice defendant's rights in such a manner as to deprive him of a fair and impartial trial. As we have previously stated we cannot presume that the jury is so susceptible as to be in any manner affected and not be able to return a fair and impartial verdict. *People* v. *Andrades*, 83 P.R.R. 818 (1961); *People* v. *Rivera, supra.*

(d) Appellant alleges that the prosecuting attorney sought to create, through inuendos, suspicion in the minds of the jury that there could have been, as motive for the commission of the facts, some family problem between defendant and his wife on account of the victim.

He relies only on a question of the prosecuting attorney to a witness, brother of appellant's wife, about whether in September a family matter connected with the deceased was discussed in his father's house. The prosecuting attorney withdrew the question. The prosecuting attorney did not refer at any time to problems between appellant and his wife on account of the victim. With respect to the statements made by the prosecuting attorney in his argument in rebuttal about such points, which were objected to, the judge charged the jury that:

"You should not take into consideration the last words connected with the recital there might be of the hearing concerning the Breach of the Peace and the connection there might be between the member which was cut from the human being and the Breach of the Peace concerning defendant's wife. With respect to those points you shall not take those statements into

consideration. You will efface them from your mind and you will disregard them."

(e), (f), (g) Appellant complains that the prosecuting attorney, for the purpose of establishing a motive, sought to present hearsay evidence that appellant prior to the events of the case had attacked the deceased's father on account of a discussion concerning a boundary line; that this situation was aggravated when the prosecuting attorney informed the jury that a corpulent man such as defendant "gave Don Pablo a blow and in the way in which he gave him the blow, he will do any stunt, and that such a man is capable of anything." He also argues that the prosecuting attorney's conduct was improper in calling appellant "murderer" while at the same time pointing at him, a fact admitted by the prosecuting attorney.

■ Only one of the two witnesses did not witness the encounter between appellant and the deceased's father. The court ordered to strike out this testimony. The other was an eyewitness. Also appellant himself admitted the encounter and that he struck the said man with the machete. *People* v. *Martínez Lucena*, 92 P.R.R. 859, 861, 862 (1965). The judge charged the jury on this particular in the following manner:

". . . the defendant is entitled to be tried for the offense charged in the information which I told you before, and not on the ground of other offenses committed by defendant, if any. That evidence about other offenses committed by defendant which was introduced in this case is admitted only to show the motive or purpose, but the court charges you that defendant is being tried for the offense of Murder in the First Degree and not for the offenses. . . ."

The comments of the prosecuting attorney to the jury on the margin of the incident of the attack of the deceased's father are legitimate even though they might be improbable, illogical, erroneous, or absurd. *Fournier, supra* at p. 394.

■ As to the epithet "murderer", it appears from the record that the trial judge admonished the prosecuting attorney immediately warning him that he should not, thereafter, refer to appellant in that manner. The fact that on one occasion during the arguments to the jury the prosecuting attorney used that epithet is not an indication that defendant's substantial rights were prejudiced nor that the verdict was influenced by the use of such language.

■ (h) Appellant assigns that the prosecuting attorney exacerbated the minds of the jury against appellant upon making contrasts between the latter's economic solvency and the poverty of the victim of the murder referring to "masters", "potentates", "rich", "poor", "ruined", and that justice had also been made for the rich. The trial court dismissed the objection because it understood that the prosecuting attorney may draw inferences from the evidence in the record about what appellant cultivated. There was also evidence that relatives of the deceased and other witnesses were agricultural workers. As we said in *People* v. *Fournier*, *supra* at pp. 394–395, ". . . The prosecution as well as counsel for the defense may use oratorical, literary or poetic figures of speech and even indulge in certain vituperations and invectives which do not necessarily constitute misconduct. . . . Even assuming that the district attorney made improper remarks in his address, a reversal would not lie unless it were shown that they resulted in prejudice to the substantial rights of the defendant, that is, that the verdict was influenced by such misconduct." By virtue thereof, we believe that the assignment is frivolous.

■ (i) It is alleged that during appellant's cross-examination the prosecuting attorney slapped the stenographer's desk, thus violating defendant's rights. The incident does not have the importance which appellant seeks to give it. The judge admonished the prosecuting attorney and warned him that he would not allow him to continue slapping

the table. Obviously the incident could not have the effect of injuring defendant's right to a fair and impartial trial.

(j) Appellant complains that the prosecuting attorney asked him during the cross-examination whether or not it was true that he had driven the prosecuting attorneys off from his property the day before the trial. Since the trial court granted defense's objection to said question and at the request of the defense charged the jury "to disregard that" it does not appear that the incident prejudiced appellant in any manner.

(k) The defense argues that the prosecuting attorneys failed to comply with their duty to reveal evidence favorable to appellant consisting in a tape recording taken by the defense during the preliminary hearing of the testimony given by the witness for the prosecution, Ramón Ramos Desardén. We agree with the Solicitor General on the grounds stated hereinafter that said recording was inadmissible in evidence.

II. In the preceding paragraph (I) (a) we have disposed of the assignment to the effect that the trial court erred in admitting in evidence the sworn statements of witness Luis Morales Quirós for the sole purpose of impeaching his testimony and not as evidence of facts recited in the same.

III, IV, V. *Inadmission of tape recording.*

Appellant alleges that the court, in refusing to admit the recording of the testimony of witness Ramón Ramos Desardén, deprived appellant of the right to confront with contrary witnesses and limited his right to cross-examination; that the court erred when it refused to hear the recording in order to determine whether it would allow (a) its use in the confrontation of the witness and (b) its admission in evidence, and that it erred in refusing to admit said recording as evidence of the defense.

For these tape recordings to be admissible in evidence they must be properly taken, identified, and au-

thenticated as a true and correct reproduction of the statements made. *State* v. *Mottram*, 184 A.2d 225 (Maine 1962); *Commonwealth* v. *Bolish*, 113 A.2d 464 (Penn. 1955). For those purposes it must be shown:

(1) That the recording device was capable of taking the testimony; (2) that the machine operator was competent to operate it; (3) that the recording was authentic and correct; (4) that changes, additions or deletions have not been made to the recording; (5) the manner in which the recording has been kept; (6) the identification of the persons who speak in the recording; and (7) that the testimony elicited was voluntarily made without any kind of inducement. See Annotation: *Admissibility of sound recordings in evidence*, 58 A.L.R.2d 1024, 1027 (1958). Appellant did not show any of the preceding circumstances upon offering the recording in evidence or prior thereto. On the contrary, the prosecuting attorney opposed it on the ground that it was taken by a friend of appellant, taking what interested the latter.

The purpose of presenting the recording was to impeach the witness' testimony that on Friday, October 1, 1965, while he worked at the property of appellant's father he saw when the latter threw a bundle into a ditch and covered it with pieces of sticks and banana plants and that when he left the witness went near the bundle and saw that there was the dorsum of a human being wrapped in an ash packsaddle. The impeachment was to the effect that at the preliminary hearing he observed such facts on Thursday, September 30, instead of Friday, October 1, 1965. The admission of the recording having been denied, the defense requested the court to summon Prosecuting Attorney Gil Morales, who had been the presiding judge at the preliminary hearing and announced that they would use Prosecuting Attorney Cordero Román, who had participated in said hearing, as witness. However, they did not use them. The defense had the opportunity to impeach the said witness during cross-

examination. Appellant himself testified that Ramos Desardén said in the preliminary hearing that he witnessed the facts in question on Thursday, September 30, 1965.

We conclude that the trial judge acted correctly in refusing to admit the recording which was not an official recording of what had occurred at the preliminary hearing and also lacked authenticity and certainty.

■ VI–VII. Appellant informs that the trial court erred in allowing the prosecuting attorney to introduce evidence of prior alleged offenses committed by appellant through witnesses who alleged having been spectators in the trial in said cases.

A witness testified that he witnessed when appellant had struck the father of the deceased with a machete on the occasion of a dispute with respect to the boundaries of the properties owned by each of them and that for that reason appellant was accused of assault and battery. He testified that "In the case of Aggravated Assault and Battery he was acquitted, I do not remember the other well, but he was punished to pay $500." The testimony in question was admissible as it may have been demonstrative of motive. The prosecuting attorney stated to the court that the purpose of offering proof of differences between the appellant and the victim of the murder and his family was to show motive or intent on defendant's part and thus it was understood by the trial court. See the citation of its instruction to the effect recited in the preceding assignment of error I(e). We have said that evidence of other offenses committed by defendant is admissible when the former offense (a) is a material fact to establish the commission of the crime charged; (b) when it is part of the *res gestae;* (c) it shows motive, intent, premeditation, malice or a common plan; or (d) forms part of the same transaction. *People* v. *Martínez Lucena, supra; People* v. *Pimentel Camacho,* 89 P.R.R. 132 (1963); *People* v. *Aponte,* 83 P.R.R. 491 (1961); *People* v.

*Fournier, supra; People* v. *Archeval,* 74 P.R.R. 478 (1953).
See also, 1 Wharton, Criminal Evidence, §§ 171 and 173,
12th ed.

VIII. *Denial of requests to discharge the jury (mistrial).*

These requests were produced after the incidents discussed in the preceding assignment of errors I(a), (b), and (j) where we indicated in effect that said incidents did not have the effect of depriving appellant of a fair and impartial trial.

 IX. Appellant objects to the following instruction given to the jury by the trial court:

": . . In criminal cases the law presumes that defendant is innocent until the contrary is proven in a satisfactory way and by competent evidence; and it is a rule of law that his guilt must be thoroughly established. This presumption of innocence accompanies defendant during the trial and you should bear it in mind at the very moment on which you begin to deliberate."

He relies on the fact that the phrase "you should bear it in mind at the very moment on which you begin to deliberate" could give the jury the impression that the presumption of innocence had to be cast aside at the moment of beginning to deliberate. After considering this instruction within the entirety of the clear and precise instructions which the trial court gave to the jury concerning the offenses to be considered about the nature of every evidence and the weight thereof, it seems obvious to us that the jury could not understand the instruction in question in the sense that the presumption of innocence accompanies defendant until the jury begins to deliberate but that, necessarily, the jury should bear it in mind when they begin to deliberate that is, during the whole process of deliberation.

X. Appellant alleges that the trial court erred in denying the following instructions requested by the defense:

". . . that evidence concerning alleged facts performed by defendant subsequent to the death of Pablo Soto Acevedo has been admitted because if that evidence, in your opinion, deserves credit and you find it established beyond reasonable doubt, it is evidence which can be used to establish defendant's guilty conscience but that evidence by itself is not sufficient to convict him of the offense charged against him.

". . . that if you consider that the testimony given in court by witnesses Luis Angel and Ramón Ramos Desardén does not deserve credit beyond reasonable doubt, it is your legal duty to acquit defendant."

 We do not agree with appellant in this assignment of error because (a) defendant's conduct after the commission of the offense not only serves to indicate consciousness of guilt on his part, but also it is relevant to establish the intent with which the acts were committed and to make inferences about defendant's guilt. See 2 Warren, On Homicide 615–617, § 215; 1 Wharton, Criminal Evidence 404–407, § 201, and (b) the instruction with specific reference to the testimony of certain witnesses for the prosecution in particular was not necessary since ample and precise instructions were given as to the credibility of witnesses, reasonable doubt, and the possible verdicts which the jury could return.

 XI–XII. Appellant maintains that the verdict is not supported by the evidence and that the trial judge erred in denying the motion for peremptory acquittal filed by appellant under the authority of Rule No. 135 of the Rules of Criminal Procedure.

·At the beginning of this opinion we made a recital of the facts which arise from the evidence of the prosecution. Appellant denied in his testimony the substantial details of said recital and the effective cross-examination of the witnesses for the prosecution sought to impeach their credibility and the fact whether, in effect, many of the essential facts related occurred. Nothing appears from the record to the

effect that the jury acted with passion, prejudice or partiality in its weighing of the evidence or that the latter was incredible or insufficient, therefore we are not justified to disturb the weighing thereof made by the jury.

XIII. For the reasons previously stated, we conclude that the trial court did not err in denying the motion for a new trial grounded on the arguments and reasonings previously discussed.

XIV. Lastly, it is argued that it does not appear from the record with certainty that the verdict was accepted by the trial court nor that the judgment rendered corresponds to the verdict.

It appears from the record that the trial court, after ascertaining that the verdict had been rendered by at least nine jurors, accepted the same. Upon verifying the verdict, the trial judge addressed each juror, one of whom answered, "I want to make a little explanation, Your Honor. The verdict which I understand was approved, there are two persons who have designated it as second degree and one first degree, I mean, three. Another answered 'In second degree.' The rest answered 'Guilty'." When he finished, the trial judge asked the members of the jury if the verdict of murder in the first degree was "nine against three and those who voted, those three persons who voted for Murder in the second degree" to which the members of the jury answered yes.

Appellant argues that the fact that juror José Avilés used the expression that "the verdict which I understand was approved . . ." has the effect of not satisfying the "spirit or purpose of the rule about the precise knowledge of the jurors who are being questioned to verify the verdict as to which has been in effect the verdict which the jury has reached."

We do not agree. The trial court duly verified that the verdict of murder in the first degree was rendered by a

majority of nine to three of the jurors. *People* v. *Moreu Pérez*, 96 P.R.R. 59 (1968). Also this issue was not raised timely by appellant before the trial court.

In view of the foregoing, the judgment rendered in this case by the Superior Court, Aguadilla Part, on January 5, 1967, should be affirmed.

Mr. Justice Hernández Matos and Mr. Justice Santana Becerra did not participate herein.