STATE OF MAINE
*vs.*
ROBERT MOTTRAM

Cumberland.   Opinion, September 12, 1962.

*Casper Tevanian,* for the Defendant.

*Arthur Chapman, Jr., County Attorney,* for the State.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WILLIAMSON, C. J. This criminal case is before us on exceptions and appeal. At the January 1958 Term of the Cumberland Superior Court the grand jury returned an indictment against the respondent, charging in the first count the larceny of an automobile being the property of one Staley and one Perkins of the value of $1,000, and in the second count that the respondent previously had been convicted of a felony and sentenced and committed to our state prison.

The respondent was tried and convicted on both counts. The conviction was sustained by our court in *State* v. *Mottram,* 155 Me. 394, 156 A. (2nd) 383. Subsequently on a writ of error *coram nobis* the Superior Court vacated the judgment of conviction and ordered a new trial.

On the second trial, from which the exceptions and appeal arise, the respondent was again found guilty on both counts. At his request he was given a separate jury trial on each count. The jury hearing the larceny count was not informed of the "habitual offender" or second count.

Staley and Perkins were key witnesses for the State. The State contends that the respondent stole the automobile from near a restaurant in Bridgton. The respondent says in substance: that he came into possession of the car lawfully; that Staley and Perkins represented to him that they were in financial difficulties; that to ease their difficulties he was requested to conceal the car and did so; and that the car was in fact delivered to him in Lewiston by Staley and Perkins. Without question, the State's case rested on the credibility of Staley and Perkins.

## FIRST COUNT — LARCENY.

EXCEPTION #1. The respondent properly does not press an exception to the refusal of the presiding justice to direct a verdict at the close of the State's case. The exception was waived on introduction of evidence by the respondent. *State* v. *Rand,* 156 Me. 81, 161 A. (2nd) 852.

EXCEPTION #2. The second exception raises the question whether it is reversible error to exclude evidence of the refusal of a witness for the State whose testimony is vital to the prosecution to take a lie detector test in the course of the investigation of the case by the police. The exception reads in its entirety as follows:

> "In the absence of the Jury, while Wendall Perkins, witness for the State was being cross-examined by Respondent's attorney, the following took place:

> "Q. (By Mr. Tevanian): Your name is Wendall Perkins?
> "A. Yes.
> "Q. And you are the same Wendall Perkins that was testifying prior to the recess?
> "A. Yes.
> "Q. Now, I ask you, Mr. Perkins, if during the investigation you were asked by the State Police to submit to a lie detector test?

> "MR. CHAPMAN: Object.

> "THE COURT: Excluded.

> "MR. TEVANIAN: If Your Honor please, I feel that I have a right to go into whether or not this man was willing to take a lie detector test on the theory that he is not a respondent in this courtroom, and (2) I am not attempting to show the results of a lie detector test, *only his refusal to take one,* which I think boils down to a matter of credibility. I think the Law Court in the Casale case has ruled that it is not proper to ask if a respondent has refused or has agreed to take a lie detector

test, but here is a man who is only a witness where it boils down to a matter of credibility. For that reason, I would press my objection and I would ask the Court to note my exceptions.

"The basis for this exception is fully set out in the above-copied proceedings." (Emphasis supplied.)

The record continues:

"THE COURT: Anything you wish to add to the record, Mr. Chapman?

"MR. CHAPMAN: Nothing, Your Honor. The objection stands. I think this matter has been fully decided by our Law Court and I will stand on the precedent of that case.

"THE COURT: Anything further?

"MR. TEVANIAN: No.

"THE COURT: Have the jury come down.

"MR. TEVANIAN: I think I got in there my reason, that I anticipated an answer that he refused to take one.

" (The jury then returned, . . . ) "

The record also contains the following references to lie detector tests. The respondent testified on direct examination:

"Q. During this interrogation did you — were you brought face to face with Hartley Staley and Wendell Perkins?
"A. Yes, I was.
"Q. And did you in the presence of Detective Holdsworth and others make accusations against Mr. Staley and Mr. Perkins?
"A. Yes, we did. I think Holdsworth asked them about some keys. He denied that, and it was chewed back and forth. Then they refused to take a lie detector test —
"MR. CHAPMAN: Object.
"A. (Continuing) : — and I offered to.

"THE COURT: That may be excluded.

"MR. CHAPMAN: May I see the Court? (Bench conference)

"THE COURT: The exclamation made by this witness pertaining to a lie detector test is rather unfortunate because it is not admissible, again under our proceedings in Maine. Under Maine law, lie detector tests are not recognized as legal evidence. If I haven't already ordered it stricken, I do order it stricken and request again that you obliterate it entirely from you minds."

There is no need of discussing the nature and effectiveness of lie detector tests. The subject is thoroughly covered in the cases and other material cited below. It is well known that such tests are valuable tools in the investigation of crime, for example, in developing leads. The lie detector test, however, has not reached the state of scientific development and accuracy that permits admission of the results in evidence. We so held in *State* v. *Casale*, 150 Me. 310, 319, 110 A. (2nd) 588, following the general rule.[1]

---

[1]  Cases and material of interest on the lie detector include the following:
  *Leeks* v. *State* (Okla.), 245 P. (2nd) 764;
  *Lusby* v. *State* (Md.), 141 A. (2nd) 893;
  *Henderson* v. *State* (Okla.), 230 P. (2nd) 495;
  *People* v. *Wochnick* (Cal.), 219 P. (2nd) 70;
  *Commonwealth* v. *Andrew* (Pa.), 115 A. (2nd) 867;
  III Wigmore, Evidence, 3rd ed. § 999;
  2 Wharton, Criminal Evidence, 12th ed. § 666;
  20 Am. Jur., Evidence § 762;
  23 A. L. R. (2nd) 1306 Anno.;
  70 Yale Law Journal 694, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection*;
  40 Iowa Law Review 440, *Scientific Evaluation of The 'Lie Detector'*;
  22 Tenn. Law Review 711, *The Polygraphic Truth Test and The Law of Evidence*;
  33 Tulane Law Review 880 (Notes) *Evidence — Admissibility of Lie Detector Evidence*;
  46 Iowa Law Review 651 (Notes) *Evidence — Lie Detector Tests — Effect of Prior Stipulation of Admissibility*;
  21 Maryland Law Review 176 (Notes) *Evidence — Lie Detector Results Admissible on Prior Stipulation.*

The question excluded was preliminary to the offer of evidence of a refusal to take the test. The respondent intended to show the refusal as evidence of a guilty conscience bearing heavily on the credibility of the witness.

The argument in favor of admissibility is that conduct is evidence of the consciousness of guilt or innocence, or in short, of guilt or innocence. The analogy is with the conduct of one who flees from the scene of the crime, or who secretes stolen property. *State* v. *Lambert,* 104 Me. 394, 71 A. 1092 (respondent armed at time of arrest) ; *State* v. *Caliendo,* 136 Me. 169, 4 A. (2nd) 837 (respondent's threats to keep witness from trial).

The decisions we make from moment to moment are repeatedly made on the strength of evidence of this nature. The principle is not peculiar to the courtroom; it is drawn from life.

In addition to refusing to admit the result of a lie detector test, the courts have also denied admission in evidence of the refusal or willingness of a respondent to take the test. The underlying reason for this rule rests in the belief that the fact finder would be unable to assess the evidence without assuming a non-existent value for lie detector tests in general.

The worth of evidence of refusal or willingness to take a lie detector test rests, in our opinion, upon a general acceptance of the worth of evidence of the result of such a test. The result does not have the accuracy entitling it to admission in evidence. It follows that a refusal or willingness to take a test of which the result would have been without value in evidence, likewise has no value for the fact finder. *Commonwealth* v. *Saunders* (Pa.), 125 A (2nd) 442 (willingness of respondent inadmissible) ; *Hayes* v. *State* (Okla.), 292 P. (2nd) 442 (voluntary submission by defendant to lie detector test inadmissible).

In *State* v. *Kolander*, 52 N. W. (2nd) 458, the Minnesota Court held it was prejudicial error to admit the refusal of the defendant to submit to a lie detector test. The court said, on p. 465:

> "The state concedes that the results of a lie-detector test would not be admissible, but contends that it may nevertheless be shown that defendant refused to take such test, since such refusal is evidence of a consciousness of guilt similar to evidence of flight. With this we cannot agree."

> \* \* \* \* \* \* \* \* \* \*

> "There was no explanation to the jury of the operation or effect of a lie detector. As a matter of fact, it was not even shown what type of test defendant had refused to submit to. The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test, if given after a proper foundation had been laid showing how the apparatus functioned."

The willingness of a state's witness to take the test and the fact that he did so were held inadmissible in *Kaminski* v. *State* (Fla.), 63 So. (2nd) 339, in an attempt to rehabilitate credibility of the witness. The court said, on p. 340:

> "For there can be no doubt that in initiating the inquiry the prosecutor intended to leave in the minds of the jurors the impression that because the witness Newbold had voluntarily submitted to a lie detector test prior to the time of trial he was a man of veracity and hence was telling the truth from the witness stand, no matter how inconsistent his tale might appear to be to the jurors when compared with the testimony offered by other State witnesses."

The respondent here sought to destroy the credibility of Perkins by his refusal to take the test. The Florida case

presents an analogous situation. In each instance, whether willingness or refusal is the immediate fact, the real purpose is to impress upon the jury the weight of the result of a lie detection test.

We have here, however, not the respondent whom it may be argued is entitled to more careful treatment than the witness Perkins who is not on trial. Further, we have a witness whose credibility is of the utmost importance to the State's case and who refused (we assume) to take the test during the investigation by the police of the crime allegedly committed by the respondent.

There is no question whatsoever of the right of the respondent to submit to the jury all evidence reasonably bearing on the credibility of a state's witness. Consciousness of guilt on the part of Perkins in connection with the affair from which the charge against the respondent arose obviously would be important evidence for consideration of the jury in evaluating Perkins' testimony.

Under the rule urged by the respondent, the refusal of the witness to take the test necessarily would be open to explanation. The refusal may have been based on a belief that the lie detector test was inaccurate and without any value, or on his condition let us say, of nervousness, or illness, or simply fear of taking a strange and unknown test. We do no more than suggest lines of evidence available to rehabilitate the witness from the adverse effect of the refusal.

In our opinion, far reaching as the explanation might be, the jury in practice would give weight to the refusal to take the test in the belief that the test itself would have had value if taken. The inference would be quickly and erroneously drawn from refusal to consciousness of guilt to guilt.

Wigmore writes of refusal to undergo a superstitious test as evidence of guilt. II Wigmore, Evidence, 3rd ed. § 275. He cites as an example evidence that the defendant at the

morgue was requested with others to put his hand on the corpse of the murdered man but he refused. *State* v. *Wisdom* (Mo.), 24 S. W. 1051. The case at bar has only a superficial likeness to such a situation.

Conduct is measured in the Wigmore example against a superstitious belief, and in our daily living against our own experience. Here the respondent seeks to measure conduct against a machine popularly believed to operate on scientific principles, but as yet unaccepted as an accurate instrument to determine truth. Until the result of such a test is admissible, we are of the view the refusal must be excluded.

The entire incident, including the critical question of Perkins, the objection of the prosecutor, and the offer of proof properly took place in the absence of the jury. The offered proof, giving it the widest range, goes no further than to establish the refusal of the witness to take a lie detector test without reasons for the refusal.

Mere refusal or willingness to take such a test is inadmissible for reasons we have stated. In reaching this conclusion we by no means exclude from consideration other possibilities. For example, consciousness of guilt could be shown by evidence that a witness refused to take a lie detector test on the ground that he believed the test was trustworthy or dependable. If, however, the evidence showed a contrary belief by the witness, namely, that the test was not trustworthy or not dependable, no inference of consciousness of guilt could be drawn.

In the case at bar the proof offered stops short of an admission destroying or tending to destroy credibility. There is only the refusal to take a lie detector test offered as a base in evidence touching credibility. Hence the evidence offered was not admissible.

Cases cited by the respondent in which a lie detector test has been mentioned in evidence do not in our view reach

the issue before us. In *Tyler* v. *United States,* C.A. D.C., 193 F. (2nd) 24, 31, the court approved the following ruling of the trial court:

> " 'The statement of the witness (polygraph operator) that he told the defendant that the machine indicated he was lying is not admitted as evidence of any alleged lying of the defendant, but merely as evidence bearing upon the question whether the confession was, in fact, voluntary.' We think the ruling was correct. This court has held the results of a lie detector test to be inadmissible. *Frye* v. *United States,* 1923, 54 App. D. C. 46, 293 F. 1013. We do not mean to impair that ruling. But here the circumstances are different. The evidence had a material bearing upon the conditions leading to Tyler's confession and was relevant upon the vital question as to whether the same was voluntary."

In *LeFevre* v. *State* (Wis.), 8 N. W. (2nd) 288, without objection by the respondent facts of a stipulation relative to use of findings in proposed tests were admitted. The findings, however, were excluded on objection by the State. There is language in the opinion indicating that evidence of willingness of a respondent to take a test may be admissible. We are not persuaded that this should be the rule.

In *State* v. *Sheppard,* C. A. Ohio, 128 N. E. (2nd) 471, 498, the court said:

> " 'Did you, Mr. Houk, submit to a lie detector test?' to which he answered over defendant's objection, 'Yes.' The results of the test were not inquired about, and the simple fact that a test was made by agreement of the witness under the circumstances could not prejudice the defendant's case."

If the Ohio Court considers the evidence inadmissible, as we do, the opinion stands on ground of harmless error. The issue here is not error from admission but from exclusion of evidence.

The ruling was correct and the exception is overruled.

EXCEPTION #3.   The exception reads as follows:

"During the course of the trial, the attorney for
the Respondent offered as evidence certain sound
recordings of an interview that took place in the
office of that County Attorney prior to Respond-
ent's first trial on these charges which was held at
the January Term of Court, 1958.   Present at this
interview were the Respondent, his attorney (Mr.
Tevanian), witness for the State, Law Enforce-
ment officers, and a representative of the County
Attorney's office.   Relative to Respondent's prof-
ferance of this evidence the following colloquy
occurred:

"THE COURT:   As I understand it, you are offer-
ing the records for the purpose of playing them
before the jury?

"MR. TEVANIAN:   That is correct.

"MR. CHAPMAN:   May I be heard, Your Honor?

"THE COURT:   You may be.

"MR. CHAPMAN:   I must object to the playing
of these records to the jury.   They were recorded,
I might call it, in an informal interrogation ses-
sion.   There is a great deal of irrelevant matter
on there; there is matter that pertains to other
cases; there is, in fact, a host of various irrelevant
matters, hearsay matters, that are on those rec-
ords.   Now, Mr. Tevanian has had complete access
to them.   The County Attorney's office hired a Hi-
Fi record player in an attempt to bring out these
records to the highest fidelity, the recording ma-
chine wasn't working properly at that time; parts
of the records are completely unintelligible; some
parts can be heard with close attention, and Mr.
Tevanian and myself spent all of last Friday after-
noon listening to those records; Mr. Tevanian

made notes so that he has had complete access to their contents and he has complete access now. The machine is right in there. If he wishes to play them back again, or Mottram for any reason wishes to listen to them, they are available for counsel to use, but I would object for these reasons to the entire records being played on a machine to the jury.

"THE COURT: What do you have to say to that, Mr. Tevanian?

"MR. TEVANIAN: Your Honor please, for the purpose of the record, may I first question Holdsworth (state police officer) ; then I will attempt to answer the County Attorney.

"THE COURT: You may, sir.

"Q. (By Mr. Tevanian) ; You have made — You were present when these records were made, and assisted in making them; is that not correct?
"A. Yes, sir.
"Q. And this contains the interview that you had with Mr. Hartley Staley, Mr. Wendall Perkins and Mr. Robert H. Mottram?
"A. Yes, sir; plus —
"Q. And as a matter of fact, it is the complete recording of all of the interrogation of January 28, 1960, is it not?
"A. All of the people that were there; I believe so, sir.
"Q. And these records were made on what type of a machine?
"A. On a Soundscriber.
"Q. And they were made by you and Regina?
"A. Yes, sir.

"MR. TEVANIAN: Now, as to the contention that my Brother has, if Your Honor please, I agree with my Brother that there are many immaterial and irrelevant matters on the records. I also am forced to agree with him they are not completely intelligible, that I had a difficult time understanding and following some parts, but on some of the

records I found some vital information that I think would be of value to the jury.

"THE COURT: If those vital parts that you refer to could be separated from that which is not intelligible and that which is not material and separated from matters that perhaps might be matters that would offend the issues in this case or might tend to be confusing rather than aiding, then I should admit that part of the record, if it can be separated, that you desire and which you think would be helpful to the defense in this case; but if it is all intermingled so that you cannot separate it, then I would be compelled to exclude the use of those records for the reasons that I have just stated.

"MR. TEVANIAN: I am not — I have no idea whatsoever, if the Court please, whether or not they can be separated, whether they can be segregated. I do know there are sections that do go into vital parts that are also within other sections that are inadmissable. I just don't know what to do.

"THE COURT: Well, of course if you don't know, I certainly don't know, You have tried to listen to those records and you know what is in them and I don't. Apparently, from what you now state, I can't see how they are admissable in the condition which they are in. I shall, therefore, exclude them.

"MR. TEVANIAN: Might my exception be noted?

"THE COURT: It may be noted.

"MR. TEVANIAN: That is all.

"Thus the exclusion of this evidence *in toto*, when Respondent contended that parts of it were vital to his defense, denied Respondent a substantial right, deprived him in part of asserting his defense greatly to his prejudice."

There is no objection in general to the introduction in

evidence of sound recordings properly taken and authenticated. *State* v. *Lorain,* 141 Conn. 694, 109 A. (2nd) 504, 507; *Commonwealth* v. *Bolish* (Pa), 113 A. (2nd) 464, 477. The fact that the recording is partly inaudible does not prevent the use of the remainder. No more does the fact that the recording contains immaterial and hearsay matters which cannot be segregated render the recording inadmissible for that reason alone. *U. S.* v. *Schanerman,* 150 F. (2nd) 941, 944; *People* v. *Feld,* 305 N. Y. 322, 113 N. E. (2nd) 440; 58 Am. Jur., Witnesses § 114. Recordings may also be properly used for purposes of impeachment. *State* v. *Porter* (Mont.), 242 P. (2nd) 989. There is no dispute about the applicable principles.

The point of the judge's refusal to admit all of the recordings lies in his statement that, "I can't see how they are admissible in the condition which they are in."

There was no flat refusal to admit recordings in violation of the accepted principles. The respondent could have taken further action to separate the good from the bad, the admissible from the inadmissible in the recordings. He did nothing but chose, in spite of his knowledge of their contents, to leave the recordings "in the condition which they are in." He sought to introduce the recordings *in toto* with no attempt whatsoever to select the good and abandon the bad. The ruling was correct and the exception is overruled.

## SECOND COUNT — "HABITUAL OFFENDER."

EXCEPTION #1. At the commencement of the trial the respondent moved to quash the indictment on the ground that there are two distinct statutory provisions set forth below which enlarge the sentence for one who has been convicted more than once for the crime of larceny. The contention of the respondent is that the indictment must specify the statute with the violation of which he is charged that

he may defend himself adequately and be protected in the event of a subsequent trial for the same offense.

The first count of the indictment charges the larceny of an automobile. The second count of the indictment, with which we are here concerned, reads:

> "And the Grand Jurors upon their oath aforesaid, do further present that the said Robert H. Mottram was convicted of a felony in the State of Maine, to wit: On the 17th day of June in the year of our Lord one thousand nine hundred and fifty-two, at the Superior Court in the County of Androscoggin and State of Maine, he was convicted of the crime of larceny of an Automobile of the value of over One Hundred Dollars and was sentenced by the Honorable Arthur Sewall, Justice of the Superior Court, to serve a term of not less than one year nor more than two years in the Maine State Prison, and in pursuance of said sentence was committed to the said Maine State Prison; against the peace of said State, and contrary to the form of the statute in such case made and provided."

The statutes to which the respondent refers are:

> "**Common Thief.** — Whoever, after being convicted of larceny as principal or as accessory before the fact, is again convicted thereof, or is convicted of 3 distinct larcenies at the same term of court, shall be deemed a common thief and be punished by imprisonment for not less than 1 year nor more than 15 years." R. S., c. 132, § 10.

> "**Punishment when convict previously sentenced to any state prison.** — When a person is convicted of a crime punishable by imprisonment in the state prison, and it is alleged in the indictment and proved or admitted on trial, that he had been before convicted and sentenced to any state prison by any court of this state, or of any other state, or of the United States, whether pardoned therefor or not, he may be punished by imprisonment in the

state prison for any term of years." R. S., c. 149, § 3.

We find no merit in the contention of the respondent. It is plain on reading the indictment that the State sought to bring the charge within R. S., c. 149, § 3, relating to punishment of a convict who has been previously sentenced to a state prison. There could have been no confusion in the minds of the respondent, the court, or the jury in this respect. The exception is overruled.

EXCEPTION #2, relating to denial of motion for continuance, was waived by the respondent.

EXCEPTION #3. At the close of the evidence in the trial of the "habitual offender" count, the respondent moved for direction of a verdict of not guilty. Exception was taken to denial of the motion. The argument was made on the ground that the State "has not negated the possibility of an appeal and a final conviction," to use the words of respondent's attorney.

In our view the prior conviction of the respondent was sufficiently shown in evidence. It was not necessary for the State to deny the possibility of an appeal. This is not the situation wherein an appeal was pending. See *State* v. *De-Bery*, 150 Me. 28, 103 A. (2nd) 523.

The State must maintain its burden of proving beyond a reasonable doubt that the respondent has been previously convicted within the meaning of the "habitual offender" statute. This does not preclude, however, the shifting of the burden of going forward with the evidence under certain circumstances. We see no reason why, when the State has offered credible proof of the conviction of a respondent, thus establishing a prima facie case, the burden should not shift to the respondent to go forward with evidence to show, for example, that the case is on appeal.

In *State* v. *Mottram, supra,* the issue was not raised by

the respondent, although open to him then as now. It is of significance that in the many years since the enactment of the "habitual offender" statute this issue has not been brought before us, so far as we are aware. The exception is overruled.

EXCEPTION #4. The respondent gains nothing from the exception to the following argument made by the county attorney in rebuttal:

> "The State has proven that Mottram was convicted, that he was sentenced, and in pursuance of said sentence he was committed to the Maine State Prison, and if Mr. Tevanian (defense counsel) or Mr. Mottram desired in defense they could have come forward with defense to show that the prima facie case as presented by the State, and rebut the presumption — and rebut the evidence — I don't say 'the presumption'; I mean 'evidence'; I am sorry."

The error complained of is reached by a motion for new trial and not by exceptions. *State* v. *Martel,* 103 Me. 63, 68 A. 454; *State* v. *Carter,* 121 Me. 116, 115 A. 820. We have, however, considered the issue as properly raised and conclude there has been no error warranting a new trial.

The respondent argues that the county attorney improperly commented on the failure of the respondent to take the stand and testify in his own defense. R. S., c. 148, § 22 reads: " . . . and the fact that he (the accused) does not testify in his own behalf shall not be taken as evidence of his guilt." See *State* v. *Banks,* 78 Me. 490, 7 A. 269; *State* v. *Landry,* 85 Me. 95, 26 A. 998.

The State urges that the county attorney did not comment on the failure of the respondent to take the stand, but only on his failure to introduce evidence in rebuttal.

We need not decide the issue from the rebuttal argument alone. It sufficiently appears that the presiding justice

made clear the rights of the respondent in the charge. Any ambiguity in counsel's remarks was thereby removed. The charge reads:

> "A respondent is not required to take the witness stand and give testimony, and if he sees fit not to testify, that shouldn't be used as evidence of his guilt. When he does not take the witness stand, he is merely exercising his constitutional right. We do not compel a respondent to give evidence against himself and, if he does not see fit to take the witness stand, it must not be considered as evidence in any way of the guilt of a respondent. The law puts the burden upon the State to prove its case without assistance or aid on the part of the respondent."

EXCEPTION #5 was waived. The same point was raised and determined under Exception #3.

### SECOND COUNT — APPEAL.

The respondent, as a sole ground for appeal following denial of motion for new trial on the second count, argues that "The charge of the Presiding Justice, as a whole, had the effect of removing the issue of prior conviction from the jury's consideration."

The following excerpts from the charge are called to our attention:

> "So that you have before you the second count, and it is for you to decide on the evidence presented whether the respondent in this case is the same Robert Mottram that was convicted here today on the first count of this indictment. If he is not the same Robert Mottram and he is not the Robert Mottram that was convicted in the Androscoggin County Superior Court on the 17th day of June, 1952, then he is entitled to a verdict of not guilty."
>
> * * * * * * * * * * * * * * * *
>
> "But the mere fact that there is a record does not necessarily prove the guilt of this respondent be-

cause you must be satisfied from the evidence presented here that the record that was admitted in this case refers to the Robert Mottram who was the respondent in the first count of this indictment and was the respondent in the indictment that was returned by the grand jury of Androscoggin County at their June Term, 1952."

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Was this Robert Mottram that is the respondent at the bar here the same Robert Mottram that was convicted by the Androscoggin County Superior Court on June 17, 1952, and was he sentenced to the State's Prison?"

It is sufficient to say that there were no exceptions to the charge as given and no requests for instructions on this point. The respondent was in no way prejudiced. This is not a proper case for granting of appeal under the doctrine of *State* v. *Wright*, 128 Me. 404, 148 A. 141. There was no manifest error depriving the respondent of his lawful rights. On reading the record, we are satisfied that the jury was fully justified in finding that the respondent was an "habitual offender" within the statute.

The entry will be

> *Exceptions overruled.*
> *Appeal dismissed.*
> *Judgment for the State.*