STATE of Missouri, Respondent,

v.

Daniel Lee FAUGHT, Appellant.

No. 10068.

Missouri Court of Appeals, Springfield District.

Jan. 11, 1977.

Motion for Rehearing or Transfer Denied Feb. 7, 1977.

Application to Transfer Denied March 14, 1977.

Devon F. Sherwood, Springfield, for appellant.

John C. Danforth, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for respondent.

Before BILLINGS, C. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

A jury found defendant Daniel Lee Faught guilty of murder in the first degree and he was sentenced to life imprisonment. The victim of the slaying, which took place on April 24, 1974, was Herbert Walford ("Butch") Masters, Jr. Defendant appeals. This court has jurisdiction of the appeal. *Parks v. State,* 492 S.W.2d 746 (Mo. banc 1973).

Defendant's first point, a valid one, is that the trial court erred in admitting into evidence, over the objection of defendant, a portion of the testimony of state's witness Ronnie Ingram. Defendant's counsel, anticipating the testimony, made extensive objections which the trial court overruled immediately prior to its reception. The challenged testimony, involving a statement made by defendant "in the middle of May," 1974, is as follows:

"Q. (By the assistant prosecuting attorney) Now, Ron, you said that when you came in the door of the defendant's house he asked you if you were followed and he said that this detective had just been out there. What was the statement he made to you?

"A. His statement that he made to me was that Detective Lindsey had come out there to talk to him about to take a polygraph test about Butch's disappearance and he said, 'You know that I cannot do that,' and he was upset and nervous, and he said, 'Can they make me take a polygraph test?'"

■ In Missouri, in the absence of a stipulation between the state and the defendant, *State v. Fields,* 434 S.W.2d 507 (Mo. 1968), results of a lie detector test are not admissible in evidence. *State v. Weindorf,* 361 S.W.2d 806, 811[17] (Mo.1962); *State v. Stidham,* 305 S.W.2d 7, 18[20] (Mo.1957); *State v. Cole,* 354 Mo. 181, 188 S.W.2d 43[13] (1945). See 23 A.L.R.2d § 2, pp. 1306, 1308, where federal authorities and 39 state courts are cited to the effect that the results of such tests are inadmissible. The reason for the rejection of the results of lie detector examinations is that they lack scientific support for their reliability. *State v. Jacks,* 525 S.W.2d 431, 435[6] (Mo.App. 1975).

■ In *State v. Bibee,* 496 S.W.2d 305 (Mo.App.1973) this court held that the trial court did not err in rejecting evidence offered by the defendant to prove that prior to the trial he was willing to undergo a lie detector test concerning his guilt or innocence. The court pointed out that an offer by an accused to take a lie detector test has no probative value because the "accused has

nothing to lose by making the offer." The test results being inadmissible, such an offer is merely a self-serving one made without possible risk. This court also said, at p. 316: "It is obvious that neither a professed willingness *nor a refusal to submit to such a test* should be admitted." (Emphasis added)

"It is generally held in criminal prosecutions that evidence is not admissible that the accused was willing or unwilling to take a lie detector test. The contention that evidence of the accused's refusal to take a lie detector test tends to establish consciousness of guilt, and that evidence of the accused's willingness to take such a test shows consciousness of innocence, has been uniformly rejected. . . ." 29 Am. Jur.2d Evidence § 296, p. 341. To similar effect see Wharton's Criminal Evidence, 13th Ed., Vol. 3, § 630, p. 252; Underhill's Criminal Evidence, 6th Ed., Vol. I, § 150, p. 388; 22A C.J.S. Criminal Law § 636, p. 495.

Foreign authorities, impressive by their number, their respective sources, and their unanimity, have held that it is improper to admit evidence of the unwillingness of an accused to take a lie detector test. *Bowen v. Eyman,* 324 F.Supp. 339 (D.Ariz.1970); *People v. Carter,* 48 Cal.2d 737, 312 P.2d 665 (1957); *People v. Parrella,* 158 Cal.App.2d 140, 322 P.2d 83, 87 (1958); *Mills v. People,* 139 Colo. 397, 339 P.2d 998 (1959); *State v. Chang,* 46 Haw. 22, 374 P.2d 5, 12 (1962); *State v. Emory,* 190 Kan. 406, 375 P.2d 585 (1962); *State v. Kolander,* 236 Minn. 209, 52 N.W.2d 458 (1952); *State v. Hegel,* 9 Ohio App.2d 12, 222 N.E.2d 666 (1964); *Commonwealth v. Williams,* 224 Pa.Super. 298, 307 A.2d 289 (1973); *State v. Britt,* 235 S.C. 395, 111 S.E.2d 669, 682 (1959). Similarly it has been held that it is improper for the prosecuting attorney, in the presence of the jury, to comment upon the fact that the accused was unwilling to take a lie detector test. *State v. Green,* 254 Iowa 1379, 121 N.W.2d 89 (1963); *State v. Stafford,* 213 Kan. 152, 515 P.2d 769 (1973); *State v. Driver,* 38 N.J. 255, 183 A.2d 655 (1962). Anno. 95 A.L. R.2d 819 (Propriety and prejudicial effect of comment or evidence as to accused's willingness to take lie detector test.)

In *Kolander,* a landmark authority on the point, the state argued that although results of lie detector tests are inadmissible, evidence that defendant refused to take such a test should be admitted because it demonstrated a consciousness of guilt similar to evidence of flight. The same contention is made by the state here. The Minnesota court rejected that contention and held the admission of evidence of such refusal to be prejudicial error. The court said, at p. 465: "The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test, if given after a proper foundation had been laid showing how the apparatus functioned."

In *Mills,* where the court also rejected the "consciousness of guilt" argument, it was held that prejudicial error arose in the admission of evidence that the defendant refused to undergo a lie detector test. The court criticized the prosecuting attorney for being overzealous and said that he had introduced "testimony which is uniformly held to be incompetent, in an unbroken line of authorities throughout the nation." Similar criticisms of overzealousness on the part of the prosecutor are found in *Driver* and *Green* and may be apposite here.

In *Driver* the prosecutor's comment upon the defendant's refusal to take a lie detector test was held to be plain error and reversible although there was no objection to it. The court said at p. 658: "If the results of polygraph examinations are not competent evidence, *a fortiori,* refusal by a defendant in a criminal case to submit to one cannot be made the subject of testimony. In terms of degree of prejudice, the average jury, unfamiliar with the present scientific uncertainty of the tests, might very well be even more affected by proof of a defendant's refusal to take the test than by the evidence of results adverse to him coupled with proof of its scientific imper-

fection." The court characterized the prosecutor's comment as possessing "horrendous capacity for prejudice against the defendant."

In *Carter* the Supreme Court of California, en banc, held prejudicially erroneous the admission of evidence that merely *implied* that the defendant refused to take a lie detector test. In rejecting the State's argument that refusal to take a lie detector test revealed consciousness of guilt, the court pointed out that lie detector tests have not yet achieved enough reliability to justify the admission of their results. At p. 674 the court said: "It therefore follows that a suspect's willingness or unwillingness to take such a test is likewise without enough probative value to justify its admission. The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth."

In *Bowen* the court said that testimony concerning the accused's refusal to take a lie detector test was "constitutionally impermissible" and rejected an argument that the error was harmless because the trial court had instructed the jury to disregard the testimony. In *Britt* the court held that the admission of evidence of the defendant's refusal to take a lie detector test was prejudicially erroneous, even though the trial court instructed the jury to disregard it.

In *Hegel,* the court, in holding that defendant's refusal to take a lie detector test should not have been revealed to the jury, referred to "the manifest weight of the type of testimony erroneously admitted."

In one case, *Meyer v. Commonwealth,* 472 S.W.2d 479 (Ky.App.1971), the court held improper the admission of evidence of the defendant's refusal to take a lie detector test but also held that there was other evidence of defendant's guilt, including his own confession, which was so "overwhelming and conclusive" that reference to his refusal was harmless. In *Commonwealth v. Williams,* 224 Pa.Super. 298, 307 A.2d 289 (1973) a witness for the state referred to defendant's refusal to take a lie detector test. There was no objection made in the trial court, and the appellate court, although recognizing that the evidence was inadmissible, refused to treat it as plain error.

■ Consideration of the foregoing authorities makes it evident that testimony or prosecutorial comment to the effect that the accused was unwilling to undergo a lie detector test is highly prejudicial. Such was the ruling in some instances where the defendant made no objection to the testimony and in others where the jury was specifically instructed to disregard it. In the case at bar the defendant made extensive objections and of course the evidence was received without limitation upon its effect. The state has not cited to this court any authority holding that it was proper to admit evidence of a defendant's refusal to take a lie detector test. No case has been found where evidence of that type, timely attacked by proper objection, has been held to have been properly admitted.

The state argues, however, that the statements attributed to the defendant by Ingram are admissible because they "show more than the defendant's mere unwillingness to take the test, i. e., that his refusal or unwillingness was grounded on his belief that the machine was trustworthy and that it would therefore expose his deception." The state relies upon this language in *State v. Mottram,* 158 Me. 325, 184 A.2d 225, 230 (1962): "Consciousness of guilt could be shown by evidence that a witness refused to take a lie detector test on the ground that he believed the test was trustworthy or dependable. If, however, the evidence showed a contrary belief by the witness, namely, that the test was not trustworthy or not dependable, no inference of consciousness of guilt could be drawn."

The quotation from *Mottram* is dictum because the holding in *Mottram* was that the trial court properly excluded evidence, offered by the defendant, that a witness for the state had refused to take a lie detector test.

But even in *Mottram* appear certain statements which serve to counter the

state's argument. The court, after referring to the rule that evidence of the unwillingness of an accused to take a lie detector test is inadmissible, said at p. 228: "The underlying reason for this rule rests in the belief that the fact finder would be unable to assess the evidence without assuming a non-existent value for lie detector tests in general." The court also pointed out that it was dealing with the refusal of a witness and not with the refusal of the defendant to take a lie detector test and that the defendant "it may be argued is entitled to more careful treatment than the witness."

The other authorities cited in this opinion demonstrate that evidence of a defendant's refusal to take a lie detector test is highly prejudicial and inadmissible. To weaken that principle by giving the state an opportunity to make inquiry into the defendant's knowledge or lack thereof concerning the reliability of a lie detector might well destroy the principle itself. It would be a time consuming expedition into the defendant's knowledge of a collateral subject which itself has been branded inadmissible. And it would seem anomalous to hold that evidence of unwillingness could be shown if the defendant mistakenly thought that the machine was reliable but to hold that unwillingness could not be shown if the defendant knew, as almost all courts hold, that the machine was unreliable. Is it reasonable that a sophisticated accused, aware of the deficiencies of his mechanical adversary, should be protected but that the naive accused, ignorant of those deficiencies, could be confronted by evidence of his unwillingness? Ignorance owes no such price and the dictum in *Mottram* is unpersuasive.

Moreover, as will be seen, the defendant in the case at bar admitted conduct criminal in nature with regard to his involvement in the disposition of the body of the victim but he protested his innocence of the murder itself. Even if it is tenable that the statement attributed to him shows that he thought that lie detector results were reliable and could be used against him, any consciousness of guilt, it could be argued, was directed to his role in the disposition of

the corpse and not to the offense for which he was on trial.

Finally, the state's argument that Ingram's testimony was admissible to show consciousness of guilt, and not "merely unwillingness to undergo the test," is hampered by the fact that Ingram, as will be seen, also testified that the defendant told him that he, the defendant, had shot Butch. Armed with such a direct admission, if Ingram be believed, the state's resort to an inference based on the credibility of the same witness is not convincing. It seems clear that the state offered the evidence for the purpose of inducing the jury to speculate on what a lie detector examination of the defendant would have disclosed.

The challenged testimony is tantamount to a showing that defendant was unwilling to undergo a lie detector test. The state so concedes and of course no other construction could reasonably be placed upon it. The fact that the unwillingness was evinced by a statement to a private person rather than by a refusal to a direct request by a police officer that the defendant undergo the test does not remove the case at bar from the influence of the foregoing authorities. The same reasons which served to preclude the admission of the testimony in those cases apply with equal force here.

Accordingly, this court concludes that the trial court committed error in permitting the introduction of the challenged testimony.

Resolution of the question of whether the error is a reversible one requires an analysis of the other evidence. Defendant makes no claim that the latter is insufficient to support the conviction had it been free of the toxic effects of the lie detector testimony.

The principal witnesses for the state were Ronnie Ingram and John Coker, both of whom had been promised immunity by the prosecuting attorney for their actions in the events which they recounted.

The information charged that the defendant murdered "Butch" Masters on April 24, 1974. No eyewitness to the killing was produced by the state. According to In-

gram, he and Coker had a conversation with the defendant on April 23, 1974, in which the defendant inquired if Coker and Ingram would be interested in disposing of a dead body "for a certain amount of money." If interested, the two men were to contact the defendant the next day. During this conversation Ingram asked the defendant "Is it Butch Masters?" and the defendant did not answer.

About 1:30 p. m. on April 24 Coker and Ingram went to the defendant's place of employment and indicated their willingness to dispose of the body. The defendant told them "It is who you thought it was, Butch." He also told them that Butch's body was at Butch's house under a piece of plywood near a propane tank. The defendant paid the two men $300 and promised them more money after they had disposed of the body. Later that day Coker and Ingram went to Butch's house, found the body, took it to a remote rural area and buried it. That evening they again saw the defendant who asked them to dispose of Butch's jacket because he, the defendant, had not had time to get rid of the jacket. The next day the defendant paid the two men $140.

In the middle of May, "a month after Butch's disappearance," Ingram had a conversation with the defendant at the defendant's house, in which the defendant mentioned that Detective Lindsey had just been there. The defendant told Ingram that "they had an $80 check that they were trying to prosecute that he [the defendant] had wrote to Butch and that he thought he had got all the checks the day he shot Butch." It was this conversation which included the lie detector testimony.

During the summer of 1974 the defendant made statements to Ingram, according to the latter, to the effect that the defendant "would take care of other people like he did Butch" or "I have plans for them like I did Butch." The foregoing evidence came from Ingram.

Coker's testimony in general coincided with that of Ingram. Coker also stated that several days after he and Ingram had disposed of the body the defendant sold Coker a shotgun and told Coker that "it had been used on Butch." Coker stated, however, that he had never heard the defendant make any statement that he, the defendant, had killed Butch.

During cross-examination, Coker told the jury, by testimony which the state's brief labels as "volunteered and non-responsive," that he, Coker, had taken a lie detector test. The inference was that the results of that test were favorable to Coker's credibility.

Testimony from other state's witnesses showed that on April 24, 1974, around noon, the defendant was with Butch at Butch's home and the defendant "seemed to be in a hurry about something." This evidence came from a witness who had telephoned Butch's house and had spoken with Butch and the defendant, and from another witness who had gone to the house but had departed, leaving Butch and the defendant alone there.

The defendant, testifying in his own behalf, told the jury that he was with Butch on April 23, 1974, the day before the alleged killing. On the evening of April 23, as the defendant was leaving his place of employment, he was abducted near his place of employment by three men armed with shotguns. They accused the defendant of being Butch's partner in "the drug dealing business" and "they informed me that Butch had ripped them off for a large amount of dope and/or money and they said that Butch was where he should be, that they were going to take me out in the country."

The defendant testified that he told his abductors that he was not involved in the "ripoff." He said that they told him "You are going to have to prove you are not his partner," and I said "How in the world can I do that?" Then they said "Dispose of the body." He also said that the three men threatened the life of his wife.

The defendant said that after the three men departed he tried without success to telephone Butch. He continued his futile telephone efforts during the morning of the next day, the 24th. At noon on the 24th one of the three abductors met the defend-

ant near his place of employment, told him Butch was dead, handed the defendant $500 and told him where the body was.

The defendant admitted having had a conversation with Coker and Ingram on the evening of the 23rd. "I told them I had been approached by what I thought were some very dangerous people that wanted a body taken care of." The following day the defendant, according to his own admission, hired Coker and Ingram to dispose of the body, using the money which the defendant claimed he received from one of his abductors.

On cross-examination of the defendant the prosecutor interrogated him concerning the lie detector statements attributed to him by Ingram.

From the foregoing it is clear that the credibility of Ingram and Coker on the one hand, and that of the defendant on the other, vitally affected the resolution of the issue of defendant's innocence or guilt of the offense with which he was charged. Against such a background the injection of the lie detector testimony was clearly prejudicial. Not only was it injected by the state through the challenged testimony of Ingram, there was a clear inference arising from Coker's volunteered statement that he, Coker, had successfully passed a lie detector test. The cross-examination of the defendant with regard to the lie detector conversation added emphasis to it.

It follows that the introduction of the improper evidence entitles the defendant to a new trial.

The judgment is reversed and the cause is remanded.

All concur.