STATE of Maine

v.

Lawrence A. HILTON.

Supreme Judicial Court of Maine.

Argued Jan. 15, 1981.

Decided July 10, 1981.

Michael E. Saucier (orally), Charles K. Leadbetter, Linda S. Crawford, Augusta, for plaintiff.

Cole & Daughan, Francis P. Daughan (orally), Wells, Gregory D. Robbins, Portsmouth, N. H., for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, ROBERTS and CARTER, JJ.

GODFREY, Justice.

On six grounds defendant Lawrence A. Hilton challenges his conviction for murder: (1) that there was insufficient evidence to show that he was the killer; (2) that the trial justice improperly limited defense counsel's inquiry into the adequacy of the state's investigation; (3) that the trial justice permitted questioning on redirect examination that went beyond the scope of the preceding cross-examination; (4) that the trial justice admitted into evidence certain testimony concerning blood stains on Hilton's clothing; (5) that the trial justice excluded evidence of a prosecution witness's refusal to submit to a polygraph examination; and (6) that the trial justice refused to grant either a mistrial or an immediate curative instruction after a prosecution witness gave certain testimony with demonstrative gestures. We affirm the judgment of conviction.

## I.

### Sufficiency of the Evidence

■ On August 20, 1979, the chief of police for the Town of North Berwick found the body of Thomas Boston lying in the kitchen of a house owned by defendant, Lawrence Hilton. A medical examiner determined that Boston had died of head injuries caused by several blows from an axe. The nature of the injuries and the position of the body eliminated the possibility of suicide. On September 4, 1979, Hilton was indicted for the murder of Thomas Boston.

The case came to trial on July 7, 1980, in Superior Court, York County. During the eight-day proceeding the state presented the following evidence:

Hilton lived with the victim's mother at Hilton's house. Frequently Thomas Boston was present as well—a source of some irritation to Hilton. Boston and Hilton occasionally fought, and since Boston was of greater physical strength Hilton usually was the loser. On at least one occasion Boston beat Hilton so severely that Hilton had to be hospitalized, in turn causing him to incur unwanted medical bills. Hilton believed that Boston was responsible for the destruction of his garage by fire. Several persons testified that Hilton had threatened either to expel Boston from the house or to kill him. One witness had heard Hilton state, less than a week before the murder, that he would kill Boston with an axe.

On the day Boston died, Hilton, Boston, and one Henry Routhier had been seated together at Hilton's house drinking alcoholic beverages. An argument eventually arose among all three men. Fearing that Boston might become violent, Routhier left the house. When Routhier returned a few hours later, he found Boston dead, lying in a pool of blood. Meanwhile, Hilton had gone to a neighbor's house to call the police. The neighbor remembered seeing a drop of blood on Hilton's face.

Investigating police officers found a bloody axe underneath Hilton's bed. Hilton told the officers that Boston had committed suicide. He said he was glad Boston was dead.

On appeal Hilton argues that the evidence showing that he had committed the murder was tenuous and almost entirely circumstantial. In particular, the defendant contends that the evidence suggesting that Henry Routhier had killed Boston was as strong as that implicating Hilton.

The record does reveal evidence suggesting that Routhier might have committed the murder. However, the defendant's conviction must stand unless on the evidence

presented no rational trier of fact could find proof of guilt beyond a reasonable doubt. *State v. Allison*, Me., 427 A.2d 471 (1981). The jury could have reasonably believed Routhier's explanations for his conduct and, from the evidence, could have concluded beyond a reasonable doubt that Hilton killed Boston with his axe.

## II.

### Limitation of Inquiry into the Adequacy of the State's Investigation

On appeal Hilton contends that the trial justice improperly circumscribed his attempts to show that the state failed to pursue the possibility that others besides Hilton might have committed the murder. On two occasions during trial, defense counsel attempted to show that the state's investigation of the murder was inadequate. During the first of those efforts, defense counsel cross-examined a police officer concerning whether he or other law enforcement officials were aware of persons besides Hilton and Routhier who had fought with Boston. After the witness had stated that he knew of such fights but had not told the state police about them, the state objected to further inquiry on the ground that this evidence was unduly speculative concerning the issue of whether the police had ignored persons who had a motive to kill Boston. The trial justice sustained the objection.

■■■ Contrary to Hilton's argument, that ruling was not erroneous. The trial justice must exercise a careful discretion concerning when a question as to the extent and adequacy of the police investigation into the conduct and whereabouts of other persons at the time of the crime passes beyond the point of proper cross-examination. *State v. Inman*, Me., 350 A.2d 582, 591 (1976). Here the trial justice stopped defense counsel only after he had elicited testimony showing that the police officer had not told other investigators about persons who had fought with Boston. There was no evidence that any such person had any connection whatever with the homicide. It was within the permissible range of the

trial justice's discretion to determine that any probative value of testimony about the details of those fights would be outweighed by one or more of the countervailing considerations set forth in M.R.Evid. 403.

■■■ During the defendant's case defense counsel again sought to elicit testimony regarding the adequacy of the state's investigation. At a side-bar conference Hilton's counsel announced his intention to call a certain police officer as a defense witness in order to ask the officer whether his superiors had requested him to gather evidence showing that Henry Routhier did not have time to commit the murder. When the state objected to "any inquiry into the police officer's state of mind during his investigation," the trial justice ruled that defense counsel could ask questions about what the officer objectively did or did not do but could not inquire about the motives for his actions. To this ruling defense counsel merely said, "Fine." In the light of defense counsel's response to the justice's ruling, we must conclude that no objection to this ruling was preserved for appeal; the trial justice could well have concluded that defense counsel was content to show the policeman's purpose through objective testimony about what he did or did not do. We find no manifest error in the ruling.

## III.

### The Scope of Redirect Examination

While cross-examining a medical examiner who had testified for the state, defense counsel asked the witness whether he had observed blood stains on Boston's body after the victim was murdered. The witness replied that he had seen blood stains on the body and that some of the blood had been drawn up into the victim's clothes from a pool of blood on the floor. Although the state had not asked about the pool of blood on direct examination, the prosecutor on redirect examination asked the medical examiner where the blood forming the pool had originated. Defense counsel objected to this question on the ground that it went beyond the scope of cross-examination.

The objection was overruled, and Hilton reasserts his objection on appeal.

We find no error in the trial justice's ruling. Although M.R.Crim.P. 26(b) provides that, as a general principle, any re-examination of a witness shall be limited to matters brought out in the last examination by the adverse party, the rule recognizes an exception to that principle where the court grants special leave to broaden the scope of re-examination. Hence, even if it be thought the state's question on redirect examination went beyond the matters brought out in defense counsel's cross-examination, the justice was within his discretion in allowing the state's expanded inquiry.

## IV.

### Testimony Concerning Bloodstains on the Defendant's Clothing

Part of the prosecutor's case was to show that the person who killed Boston would not necessarily have received substantial bloodstains on his clothing. During voir dire of the state's blood-spatter expert, defense counsel objected to any testimony concerning the expert's use of Hilton's clothing in forming his opinions. The trial justice sustained this objection, and the state made no reference to Hilton's clothing during direct examination of the blood-spatter expert. On cross-examination, however, defense counsel asked the expert whether he had seen Hilton's clothing and whether he was aware that another suspect had changed his clothes before the police could examine them. The state on redirect examination asked the expert whether he had examined Hilton's clothing and, receiving an affirmative answer, questioned the expert about what he had found. When defense counsel objected to these questions, the trial justice responded, "You knew the issue of clothing was a major concern discussed off the record and out of the presence of the jury before .... He [defense counsel] brought out the fact the doctor reviewed the clothing .... The objection is overruled ...."

No authority need be cited for the proposition that a party who has successfully objected to testimony on a particular issue and thereafter intentionally elicits testimony on the same issue will be held to have waived this earlier objection. In light of the blood-spatter expert's guarded testimony concerning a possible blood spot he had found on Hilton's trousers—an article of clothing that had already been introduced in evidence without objection—we find no error in the ruling.

## V.

### The Exclusion of Evidence of Henry Routhier's Refusal to Take a Polygraph Test

Before the state called Henry Routhier as a witness, defense counsel announced his intention to cross-examine Routhier about his refusal to submit to a polygraph test. The justice ruled *in limine* that such evidence was inadmissible because the jury would tend to exaggerate its probative value with respect to Routhier's credibility. Furthermore, the justice was concerned that prejudicial media coverage of Routhier's refusal to take the test might reach the unsequestered jury.

Citing certain language in *State v. Mottram*, 158 Me. 325, 184 A.2d 225 (1962), Hilton argues that the trial justice was required to allow a voir dire of Henry Routhier to determine his reasons for declining to take the polygraph test. If Routhier refused because he believed the test was an accurate measure of truthfulness, Hilton contends, defense counsel could then have used Routhier's refusal to submit as a means to impeach his credibility.

The defendant's argument misses the point of the justice's ruling. Having heard Hilton's reasons for requesting the voir dire, the justice ruled that, regardless of Routhier's reason for declining to take the polygraph test, evidence of the refusal would be excluded because of its serious tendency to mislead the jury. The correct-

ness of the trial justice's ruling is underscored by a long line of decisions by this Court holding in various contexts that neither the result of a polygraph test nor the fact that a witness refused or was willing to submit to such examination is admissible on the issue of credibility. *See, e. g., State v. Edwards*, Me., 412 A.2d 983 (1980); *State v. McDonough*, Me., 350 A.2d 556 (1976); *State v. Gagne*, Me., 343 A.2d 186 (1975); *State v. Bowden*, Me., 342 A.2d 281 (1975); *State v. Mower*, Me., 314 A.2d 840 (1974). *Cf. State v. Williams*, Me., 388 A.2d 500 (1978) (voice print). At one time this Court suggested in dictum that where a witness refuses to take a polygraph test because he believes it is a reliable indicator of truthfulness, evidence of his refusal to take the test is admissible to show his consciousness of guilt. *State v. Mottram*, 158 Me. 325, 333, 184 A.2d 225, 230 (1962). No authority was cited for that proposition, and this Court has never employed the dictum in deciding a case. No jurisdiction has adopted a similar principle, and one state court has specifically rejected the dictum. *State v. Faught*, 546 S.W.2d 515, 518–19 (Mo.App.1977). If followed, the dictum would promote excessive consumption of time in exploring the collateral issue of the witness's reasons for refusing to submit to a polygraph test. More importantly, in assessing the witness's credibility the jurors would tend to place undue emphasis on what they believe were the witness's motives for declining the test.

■ Because this Court has never elevated the statements in *Mottram* above the level of dictum, and because that dictum represents an unnecessary and troubling exception to an otherwise clear prophylactic rule against admission of evidence of a witness's willingness or refusal to take a polygraph test, we disavow the dictum. Evidence of the results of a polygraph test or of a witness's willingness or refusal to take such a test is inadmissible to show a witness's credibility, regardless of the witness's reasons for submitting to or declining the test.

## VI.

### "Editorializing" by a State Witness

Before the state called Maine State Police Detective Peter Herring as a witness, Hilton's counsel informed the trial justice that Herring had a reputation for "editorializing" on the witness stand. The court cautioned counsel for the state to ensure that Herring was responsive to any questions put to him. During his testimony Herring related the following statement which he said Hilton had made to him: "He said that Mr. Boston had committed suicide, that he had been holding an axe over his head, had been trying to hit himself with an axe and that he had tried to take the axe away." Apparently, Herring also made gestures intended to simulate a person chopping at his own head with an axe.

Immediately after Herring testified with the gestures just described, Hilton's counsel objected and moved for a mistrial on the grounds that the state had not informed defense counsel of the behavior that Herring attributed to Hilton and that Herring's testimony seriously undermined Hilton's credibility. Because the state had given defense counsel a report by Herring which contained a closely similar admission by Hilton, and because he did not want to draw undue attention to Herring's testimony, the trial justice sustained defense counsel's objection at sidebar but denied the motion for mistrial. Although the judge declined to give an immediate curative instruction, during his final charge to the jury he stated, "Any evidence as to which an objection was sustained by the court must be entirely disregarded. And in this regard I instruct you to ignore the demonstration by Trooper Herring."

On appeal, Hilton contends that the Superior Court's refusal to grant a mistrial or an immediate curative instruction constituted reversible error. While acknowledging that defense counsel had received a copy of Herring's police report, Hilton contends that the testimony objected to represented

a violation of the state's duty of disclosure under M.R.Crim.P. 16. Although Hilton is vague on the point of how Herring's testimony prejudiced him, he seems to suggest that before Herring testified, Hilton's credibility was intact; that after the detective testified, Hilton's credibility was destroyed.

 A motion for mistrial is addressed to the sound discretion of the presiding justice. A justice's refusal to grant a mistrial represents an abuse of discretion only where there is a reasonable possibility that the objectionable evidence might have been a contributing factor productive of a guilty verdict. *State v. Saulle*, Me., 414 A.2d 897 (1980). Even if prejudicial testimony reaches the jury, the justice's election to grant a curative instruction instead of a mistrial is final, absent an abuse of discretion. The presiding justice is in a better position than the reviewing court to gauge the impact of the objectionable testimony. Only where there are exceptionally prejudicial circumstances or prosecutorial bad faith will a curative instruction be deemed inadequate to eliminate the prejudice. *State v. Butts*, Me., 372 A.2d 1041 (1977); *State v. Heald*, Me., 292 A.2d 200 (1972).

 On the face of the record in this case we are unable to conclude that Herring's demonstration was exceptionally prejudicial to Hilton—if it was prejudicial at all. Before Herring was called as a witness several other witnesses had already testified to Hilton's assertions that Boston had committed suicide; indeed, one witness recalled Hilton's saying specifically that Boston had committed suicide with an axe. Hence, to the extent that Hilton's credibility would be undermined by his explanation of Boston's death as being the result of suicide with an axe, it had already been undermined by the time Herring testified. Defense counsel had been given a police report by Herring containing essentially the same statements. Although Herring's physical demonstrations may have accentuated the effect on the jury of his oral testimony, the record does not indicate what motions Detective Herring made or for how long he made them; hence, we have no meaningful way to review the impression Herring's demonstrations made upon the jury. The trial justice is in a peculiarly advantageous position to gauge the impact of objectionable actions by a witness, and has the benefit of sensory reactions which cannot be transmitted through printed pages to the reviewing court. *See St. Pierre v. Houde*, Me., 269 A.2d 538, 540 (1970). We have no basis to conclude that Herring's statements or actions were so exceptionally prejudicial as to require a mistrial.

Nor do we find any evidence of misconduct by the prosecutor. There is no suggestion in the record that the state encouraged Herring's demonstration. There was nothing in Herring's testimony itself that was not implicit in his police report, which the state had earlier supplied to the defense.

 In the circumstances, we find no error in the justice's refusal to give an immediate curative instruction when Herring testified. The justice clearly expressed his concern that because there had been no curative instructions during the prior six days of trial, an immediate instruction might have accentuated the effect of Herring's testimony; if that testimony was prejudicial to Hilton, the instruction might have increased, rather than diminished, the prejudice. Accordingly, the trial justice was within his discretion in delaying his curative instruction until his final charge to the jury, when the impact of Herring's testimony may have diminished.

 Since there were neither exceptionally prejudicial circumstances nor bad faith on the part of the state in regard to Herring's testimony, the presiding justice was within his discretion in declining to grant a mistrial.

The entry is:

Appeal denied.

Judgment affirmed.

McKUSICK, C.J., and WERNICK, ROBERTS, JJ., concurring.

CARTER, J., concurring in separate opinion.

CARTER, Justice, concurring.

I concur fully with the result reached in this case. I undertake to set forth separately, however, my views of the proper rationale for the result reached in part V of the Majority Opinion concerning the admissibility of evidence of a witness's unwillingness to submit to a polygraph test.

I would disavow the *dictum* in *Mottram*,[1] on which the defendant relies, to the extent it indicates that evidence of unwillingness to take a polygraph test becomes admissible by a showing, without more, that the reason for the refusal was a belief in the reliability of the test as an indicator of truthfulness. In my opinion, the decision to admit or exclude such evidence should be made by the trial court, using the discretionary balancing test of M.R.Evid. 403, and giving due regard to factors that weigh heavily in favor of exclusion.

In *Mottram*, the Court's attention was focused upon the question of the scientific reliability of the polygraph. The Court noted that since the reliability of the polygraph as an instrument for the determination of truthfulness had not been scientifically established, polygraph test results were not admissible evidence. Moreover, evidence of a witness's unwillingness to take such a test was inadmissible, at least where the witness's reason for refusing was unknown, since the refusal had no probative value unless the jury attributed a non-existent reliability to polygraph testing. But the Court observed that where the witness based his refusal on his own belief that the test was reliable, then the refusal could be

used as evidence of the witness's consciousness of guilt without requiring the *jury* to attribute any reliability to polygraph tests.

While the suggestion in *Mottram* is logically sound, its application creates problems of confusing the jury and wasting time while exploring such collateral issues as the witness's familiarity with polygraph testing and his motives for refusing to take the test. In addition, we have recently recognized another factor which also weighs heavily against admission of polygraph test results or a witness's unwillingness to take such a test. In *State v. Williams*, Me., 388 A.2d 500, 502–03 (1978), we stated that "admissibility of lie detector evidence . . . poses the serious danger that a mechanical device, rather than the judgment of the jury, will decide credibility." Similarly, evidence of a person's unwillingness to take a polygraph test, even where that person believed the test to be reliable, is apt to unduly narrow the jury's focus in determining credibility. *See State v. Trafton*, Me., 425 A.2d 1320, 1322 n.2 (1981).

The jury, as the fact finder, should have an opportunity to evaluate a witness's testimony as a whole, taken in the light of the witness's demeanor, the other evidence, and common sense, combining the whole as "concurrent elements of a single intellectual equation." *Qualey v. Fulton*, Me., 422 A.2d 773, 776 (1980). The danger of informing a jury of a witness's unwillingness to take a polygraph test lies in the likelihood that the jurors, in assessing that witness's general credibility, will place undue emphasis upon their determination of why the witness was unwilling to take the test and upon their own beliefs as to whether or not such a test is reliable in indicating truthfulness.

The danger of unduly impinging on the jury's function as the assessor of credibility, compounded by the need to explore collater-

---

1. For example, consciousness of guilt could be shown by evidence that a witness refused to take a lie detector test on the ground that he believed the test was trustworthy or dependable. If, however, the evidence showed a contrary belief by the witness, namely, that the test was not trustworthy or not dependable, no inference of consciousness of guilt could be drawn.
*State v. Mottram*, 158 Me. 325, 333, 184 A.2d 225, 230 (1962).

al issues, renders the statement in *Mottram* improperly simplistic. Nevertheless, the question of admissibility of evidence about polygraph tests should not be resolved by a *per se* rule of exclusion, but rather by careful application of the discretionary balancing test of M.R.Evid. 403. In applying that test, the trial court must place special emphasis on the unique danger to jury impartiality that is posed by evidence of refusal to submit to a polygraph test. In a rare case, a trial court, applying the standards of Rule 403, may conclude that the danger of prejudice is overcome by the probative value of such evidence.[2] While such a situation seem unlikely, we cannot say as an abstract proposition that it will never occur. *See Edwards v. Black*, Me., 429 A.2d 1015 (1981). The determination that *unfair* prejudice exists can more properly be made by the trial court, in the context of the specific case, than by a judicially fashioned *per se* rule of exclusion. Where, as in the instant case, the trial court concludes that the peculiar characteristics of the evidence would lead the jury "to exaggerate its probative value" as it bears on the credibility assessment, that conclusion will be given great weight on appeal and will be reversed only for the clearest kind of abuse of discretion. I find no such abuse in this case. That conclusion is all that is required to decide *this* case.

We have in place, under 4 M.R.S.A. § 9–A, a specific procedure by which the Supreme Judicial Court can promulgate new evidentiary rules with the benefit of mechanisms that assure an in-depth study of the need for such rules as well as of the policy considerations that bear upon the formulation of a specific rule. The rule-making process presents an opportunity for consideration of the knowledge and views of the trial bench and bar and the lay public. That procedure is attuned to exploring and determining the reasons for a proposed rule of evidence on a much more comprehensive basis than is possible in the process of normal appellate review. I suggest that if a *per se* exclusionary rule is to be promulgated, it can more knowledgeably be done through the rule-making process.

---

2. Of course, as long as the polygraph is not recognized as scientifically reliable, the results of such tests themselves will be inadmissible as evidence.