**Mary I. HESELTON**

v.

**Helen WILDER, et al.**

Supreme Judicial Court of Maine.
Argued March 13, 1985.
Decided Aug. 13, 1985.

Norman & Hanson, James D. Poliquin (orally), Roderick R. Rovzar, Portland, for plaintiff.

Hunt, Thompson & Bowie, James M. Bowie (orally), Glenn H. Robinson, Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

VIOLETTE, Justice.

This appeal involves an action for defamation brought by the plaintiff Mary Heselton against the defendants Helen Wilder, Daniel Downs, and the McCrory Corporation. The case was tried before a jury in the Superior Court, Cumberland County. At the close of the plaintiff's case, the presiding justice directed a verdict for the defendant Downs. After the presentation of all of the evidence, the jury returned a verdict in favor of the plaintiff against the other two defendants, and the trial court entered judgment against Wilder and McCrory jointly and severally for $1,900 in compensatory damages, against Wilder for $2,500 in punitive damages, and against McCrory for $50,000 in punitive damages.

On appeal, Wilder and McCrory challenge the admission by the presiding justice of evidence of Heselton's willingness to take a polygraph test, the justice's instructions to the jury concerning abuse of a qualified privilege, and the awards of punitive damages. Through a cross-appeal, Heselton challenges the decision of the presiding justice to grant a directed verdict in favor of Downs.

We find that the admission by the presiding justice of evidence of Heselton's willingness to take a polygraph test constitutes reversible error. This finding makes it unnecessary for us to consider the other points raised by Wilder and McCrory. We also determine that the presiding justice erred by directing a verdict for Downs. We therefore sustain both the appeal and the cross-appeal.

I.

Mary Heselton began working at McClellan's in Westbrook, a variety store owned by the McCrory Corporation, in October of 1977. On Saturday, July 8, 1978, Heselton worked at the store from about 9:30 a.m. until noontime. Helen Wilder also worked at the store that day.

Heselton testified that she worked in the shoe department and did not operate the cash register at all on this Saturday. At one point, Heselton stated, she offered to relieve Wilder at the register, but was angrily rebuffed. According to Heselton, she and Wilder did not get along, and there had been several incidents between them at the store.

Wilder, however, testified that Heselton did relieve her at the cash register that morning so that Wilder could assist a customer. Wilder further testified that, when she was returning to resume operation of the register, she observed Heselton ringing in a customer's purchase on the machine. According to Wilder, Heselton took a twen-

ty dollar bill from the customer and, instead of placing it in the register, tucked it into her pants.

Wilder did not speak to anyone at McClellan's regarding this incident until Wednesday morning, July 12. At that time, she told Joann Strout, the manager of the Westbrook store, that she had seen Heselton take twenty dollars from the cash register on Saturday. Strout reported the incident to her supervisor, Daniel Downs, the district manager for McCrory's in Maine. Downs instructed Strout to conduct a register reconciliation immediately. This reconciliation revealed that the cash register in question was short $20.72.

On Thursday, Strout asked Heselton to come into the office at the Westbrook store to meet with Downs. Downs informed Heselton that someone had seen her take $20 from a cash register on the preceding Saturday and that this register had in fact been short. Downs then asked Heselton to sign a release. She refused to sign the release and denied taking the money. When Heselton asked who her accuser was, Downs told her it was Wilder. Downs then called Wilder into the office, where she reaffirmed her story in Heselton's presence. Heselton maintained her innocence and offered to take a lie detector test. At this point, Downs terminated Heselton's employment.

## II.

Plaintiff's Exhibit No. 2 included a signed, written statement by Downs containing the following remark: "[Mary Heselton] said she would take a lie detector test if necessary to prove her innocence." When the plaintiff offered this exhibit at trial, the defendants stated a timely objection to the portion that referred to the plaintiff's willingness to take a lie detector test. The presiding justice overruled this objection and admitted the exhibit in full. In overruling the defendants' objection the presiding justice stated:

> [A]lthough the Court is aware of the difficulties with references to lie detector

tests, which themselves are inadmissible, the Court feels that the probative value of the issue of good faith and a privilege and malice and the Defendants' knowledge, awareness of at least a Plaintiff's statement at least that she was willing to take a lie detector test, that that would outweigh under Rule 403 the—so, therefore, the Defendants' objection would be overruled. Defendant[s] needn't object any further in order to preserve their rights under that ruling.

During his examination of Downs, the attorney for the plaintiff twice elicited an acknowledgement that his client had been willing to take a lie detector test. On appeal, the defendants contend that the admission of this evidence concerning the plaintiff's willingness to take a lie detector test constitutes reversible error.

On many occasions we have noted the unique problem presented by evidence offered at trial regarding the polygraph or lie detector test. Not only do there remain "fundamental concerns with the reliability of the polygraph as an indicator of truthfulness," but there is also "the dangerous possibility that credibility will ... be evaluated by the device rather than by the trier of fact." *State v. Ledger*, 444 A.2d 404, 415–16 (Me.1982). We have "consistently held that evidence of polygraph examination results is inadmissible." *Ingerson v. State*, 448 A.2d 879, 880 (Me.1982). We have also refused in several cases to admit evidence of a person's willingness or refusal to take such a test. *See, e.g., State v. Hilton*, 431 A.2d 1296, 1300–01 (Me.1981); *State v. Burnham*, 427 A.2d 969, 971 (Me. 1981); *State v. Trafton*, 425 A.2d 1320, 1322 (Me.1981).

The plaintiff argues, however, that the admission of evidence of a person's willingness or refusal to take a polygraph test is not necessarily precluded if the evidence is offered on an issue other than that person's credibility. According to the plaintiff, the evidence that she was willing to take a lie detector test but her employer did not pursue such a test was probative on

the issue of good faith of Downs and McCrory in firing her because of the alleged theft, and therefore probative of whether Downs and McCrory enjoyed a qualified privilege[1] in respect to the defamatory communications alleged by the plaintiff. Because of the probative value of this evidence on an issue other than the credibility of the person offering to take the test, the plaintiff contends, it was within the discretion of the presiding justice to admit this evidence.

By focusing merely upon whether or not the evidence is offered on the issue of the credibility of the person offering or refusing to take the lie detector test, the plaintiff reads our decisions in this area too narrowly. We focus instead upon the actual rationale underlying our cases excluding evidence of willingness or refusal to take a polygraph examination.

> The underlying reason for this rule rests in the belief that the fact finder would be unable to assess the evidence without assuming a non-existent value for lie detector tests in general.... The worth of evidence of refusal or willingness to take a lie detector test rests, in our opinion, upon a general acceptance of the worth of evidence of the result of such a test. The result does not have the accuracy entitling it to admission in evidence. It follows that a refusal or willingness to take a test of which the result would have been without value in evidence, likewise has no value for the fact finder.

*State v. Mottram*, 158 Me. 325, 330, 184 A.2d 225, 228 (1962).

■ We determine that the reasoning expressed in *Mottram* and followed in *Hil-*

ton, *Burnham*, and *Trafton* controls this case. The evidence that Mary Heselton was willing to take a lie detector test but her employer did not pursue such a test is probative on the issue of the good faith of Downs and McCrory only if an assumption is made regarding the accuracy of such a test. In this respect, the case at bar is analogous to a case where a person's willingness or refusal to take a lie detector test is offered to bolster or impeach that person's credibility, because "the fact finder [is] unable to assess the evidence without assuming a non-existent value for lie detector tests in general." Such an assumption flies in the face of our numerous holdings regarding the questionable accuracy of a polygraph examination. *See, e.g., Ingerson*, 448 A.2d at 880; *Ledger*, 444 A.2d at 415–16; *Mottram*, 158 Me. at 329, 184 A.2d at 228.[2] Because the results of a polygraph examination are entitled to no weight, the evidence that Heselton's employer did not pursue such a test despite Heselton's willingness to take it "likewise has no value for the fact finder." *Mottram*, 158 Me. at 330, 184 A.2d at 228. To hold otherwise would erode the "clear prophylactic rule" under which we have excluded such evidence on the issue of credibility. *Hilton*, 431 A.2d at 1301; *see Burnham*, 427 A.2d at 971; *Trafton*, 425 A.2d at 1322; *cf. Mottram*, 158 Me. at 330–35, 184 A.2d at 228–31 (evidence of refusal to take lie detector test held inadmissible to show consciousness of guilt).[3]

■ The error in admitting this evidence cannot be considered harmless. *See* M.R. Civ.P. 61; M.R.Evid. 103(a). One of the major concerns articulated in our decisions

---

1. *See generally* W. Prosser, *Handbook of the Law of Torts* 788 (4th ed. 1971); *Packard v. Central Maine Power Co.*, 477 A.2d 264, 268 (Me.1984).

2. The plaintiff does not contend that "[t]he lie detector test ... has ... reached the state of scientific development and accuracy that permits admission of the results in evidence." *State v. Mottram*, 158 Me. 325, 329, 184 A.2d 225, 228 (1962).

3. *State v. McDonough*, 350 A.2d 556, 562–63 (Me.1976), relied upon by the plaintiff, is distinguishable. In *McDonough*, we found that the admission of evidence of a prosecution witness' submission to a lie detector test for the purpose of impeaching that witness' testimony did not constitute manifest error. *Id.* It is significant that the party appealing the admission of the evidence in *McDonough*, the defendant, "was in fact the moving force behind its admission" at trial. *Id.*

dealing with evidence concerning a polygraph examination is the "dangerous possibility that credibility will ... be evaluated by the device rather than the trier of fact." *Ledger*, 444 A.2d at 416. In the case at bar, credibility was of crucial importance; indeed, much of the case depended upon whether the jury believed Heselton or Wilder regarding what occurred at the cash register at McClellan's in Westbrook on the morning of July 8, 1978. The evidence of Heselton's willingness to take a lie detector test tended to artificially bolster her testimony that she did not take the money and to divert the jurors from making their own assessments of her truthfulness. "We cannot say that it is highly probable that [the judgments against Wilder and McCrory were] not affected by the" erroneous admission of this evidence. *Dunning v. Dunning*, 495 A.2d 821, 824 (Me.1985); *see State v. True*, 438 A.2d 460, 467 (Me.1981). Because the error was not harmless, we vacate the judgments against the defendants Wilder and McCrory.

### III.

At the close of the plaintiff's case, the presiding justice granted a directed verdict in favor of the defendant Downs. In support of his ruling, the justice stated:

[A]lthough there is information that Mr. Downs communi[c]ated information which a jury could find to be false and defamatory, that the evidence I don't believe—feel a rational jury could find that the Defendant Downs published within the meaning of the law the defamatory material concerning the Plaintiff.

Through her cross-appeal, the plaintiff challenges this ruling by the trial court.

It is apparent from the statement of the presiding justice that he misconstrued the law in directing a verdict for the defendant Downs. We determine that Downs did publish the information in question. *See generally* Restatement (Second) of Torts § 577 (1977). Downs himself testified that

he communicated the allegation that Heselton took $20 from the cash register to persons in McCrory's Loss Prevention Department. Although this communication to third parties may have been protected by a qualified privilege,[4] it was nevertheless a publication of the information. *See id.* at § 577 comment n ("One who is privileged to communicate defamatory matter publishes the matter, even though the communication is privileged. If the publication reaches a third person, the question is whether the privilege was exceeded or abused.")

Viewing the evidence in the light most favorable to the plaintiff, we conclude that a jury verdict for the plaintiff against the defendant Downs rationally could be sustained. It was therefore error to direct a verdict in favor of Downs. *See Packard v. Central Maine Power Co.*, 477 A.2d 264, 267 (Me.1984). Because the directed verdict was improper, we vacate the judgment entered in favor of the defendant Downs.

The entry is:

Judgments vacated.

Remanded for proceedings consistent with the opinion herein.

All concurring.

---

**4.** *See supra* note 1 and accompanying text.