**STATE of Maine**

v.

**Ronald Allen HARNISH.**

Supreme Judicial Court of Maine.

Argued Nov. 14, 1988.
Reargued May 2, 1989.
Decided June 8, 1989.

James E. Tierney, Atty. Gen., Leanne Robbin, (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Perry O'Brian (orally), Vandermeulen, Goldman, Allen & O'Brian, Bangor, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

HORNBY, Justice.

From a jury trial in Superior Court (Penobscot County, *Beaulieu, J.*), Ronald Allen Harnish appeals his conviction of murdering Frederick Desjardins. We affirm.

Between 7:00 and 7:30 p.m. on March 22, 1986, while walking their dog, Mr. and Mrs. Barry, Frederick Desjardins's next-door neighbors, heard two loud noises come from his house. Immediately thereafter they saw two people walk out of Desjardins's house, one following the other. Mr. Walton, Desjardins's next-door neighbor on the other side, also heard two loud noises resembling a slamming door come from Desjardins's house sometime between 7:00 and 8:00 P.M., but closer to 7:00. At approximately 10:00 P.M., Ms. Wentworth, a friend of Desjardins, discovered his body on the floor of his house with blood around his head. She called the police. When the police arrived they checked the body for signs of life and found it cold and stiff. The medical examiner testified that gunshot wounds to Desjardins's neck and abdomen caused his death. It was later determined that the weapon was a .41 magnum handgun.

The police found some ripped-up paper in Desjardins's trash. It contained a list of names with dollar figures. On the list the figure of $1,065 was written next to the name Ron. Ronald Harnish testified that around March of 1986 he may have owed Desjardins $1,065 for cocaine and marijuana. Donald Coffin testified that he and Harnish purchased cocaine from Desjardins on credit and paid him back as they sold the cocaine.

Donald Coffin testified to the following account of the murder. While at Coffin's trailer at 6:30 on the evening in question, Harnish took a .41 magnum handgun that Coffin kept in the desk drawer. Harnish told Coffin that he wanted to kill Desjardins. Coffin and Harnish left the trailer and drove to Desjardins's house in Orono. When they arrived at approximately 7:00 P.M., they went into the living room where the television was on. Harnish went into the bathroom. A few moments later, Desjardins went into the room adjacent to the bathroom. In rapid succession Coffin heard a shot, a scream from Desjardins, and a second shot. Harnish told Coffin to take Desjardins's wallet, and he did so. Coffin wanted to go home but Harnish told him that they had to be seen. They went to the home of Pat Almenas where they arrived at approximately 7:45, and later to a succession of other places.

Harnish gave a different version of the evening's events in his testimony. After the day's activities, he and Coffin arrived back at the trailer at 6:00 P.M. and remained there until approximately 7:00 P.M. While at the trailer Harnish took a shower and changed his clothes. He denied taking Coffin's handgun and denied saying that he was going to kill Desjardins. Harnish testified that from the trailer he and Coffin went directly to Pat Almenas's house. Harnish further testified that he did not learn that Desjardins had been shot until Nancy Langan called him on Sunday, March 23, at his parents' home. Nancy Langan testified that when she told Harnish that Desjardins had been shot and killed, Harnish "couldn't believe it any more than the rest of [them]." She also testified that after she accompanied Harnish to the police barracks, Harnish told her that "Fred had been shot in the side and in the mouth, and that apparently a bullet grazed his leg," and that he had been shot with "either a .44 or a .41 caliber." Harnish testified that he acquired this

knowledge from the police during his interview. Detective Zamboni, who conducted the interview, testified that he never informed Harnish of either detail.

### Negative Fingerprint Report

 The State neglected to turn over a police fingerprint analysis to Harnish until after the trial, an admitted discovery violation. The analysis involved 29 items seized from Desjardins's house. None of them revealed any of Harnish's fingerprints. The report was prepared by a detective before the trial, but due to a vacation was not typed up and made available to the prosecution until after the trial. It thus did not reach Harnish's lawyer. The trial court denied Harnish's motion for a new trial.

As Harnish recognizes, the imposition of sanctions for a breach of M.R.Crim.P. 16 is committed to the discretion of the trial court. *State v. Reeves*, 499 A.2d 130, 133 (Me.1985). We find no abuse of discretion in the court's refusal to grant a new trial here. During the trial, Harnish's lawyer asked a detective on the stand how many items were seized and sent for fingerprint analysis. Then, in his closing argument, he pointed out to the jury that the State had not provided any fingerprint evidence resulting from the analysis. At the hearing on the motion for a new trial, Harnish's trial lawyer testified that the negative fingerprint report would not have helped the defense, because the fingerprints were not taken from items in areas where Donald Coffin had placed Ronald Harnish during the events in the house.[1] Thus, the discovery violation was not so prejudicial that the trial court was required to grant a new trial. *State v. Landry*, 459 A.2d 175, 177 (Me.1983).

Likewise, we find no violation of Harnish's due process rights under *Brady v.*

*Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because we conclude that the report was not material:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The absence of Harnish's fingerprints on these five items simply does not rise to that level.

### Polygraph Reference

During the testimony of Nancy Langan, the prosecution questioned her regarding Harnish's reaction to his interview with the police.

Q. ... And did he say anything to you when he was finished with his interview?

A. That he was upset.

Q. Did he say why he was upset?

A. They were trying to say that—they wanted him to take a lie detector test.

No objection was raised. After posing several additional questions, the prosecution asked:

Q. Now, you said that after this interview he came out, and I guess you were already done, and he said that he was upset?

A. Yes.

Q. Did he say why he was upset again?

At this point Harnish's lawyer requested a sidebar conference, objected to the question and moved for a mistrial because of the polygraph reference. He explained that he had not moved for a mistrial earlier in order to avoid focusing the jury's atten-

---

1. In fact, only five items from the scene produced fingerprint impressions that could be evaluated. Of the 14 impressions on the five items, none matched either Harnish or Coffin. The five items were a stereo manual, taken from a closed desk drawer in Desjardin's living room, and a Coke can, Pepsi bottle, Michelob bottle and St. Pauli Girl bottle, all taken from a table in the living room. The value of this evidence is marginal at best. At most it shows that Harnish did not touch these five items. That was not inconsistent with Coffin's testimony that he and Harnish were at the house for only about ten or fifteen minutes. Coffin did not refer to any drinking of beer or soda or use of the stereo manual.

tion on the remark. The prosecutor explained that he had anticipated that the witness would testify that Harnish said he was upset because the police had accused him of involvement in the homicide. The presiding justice responded, "You're skating on thin ice, .. Do you want to withdraw the question?" The prosecutor withdrew the question, no curative instruction was requested and the court denied Harnish's motion for a mistrial.

Under our precedents, "the results of polygraph tests and a party's willingness or unwillingness to take such a test are inadmissible," *State v. Trafton*, 425 A.2d 1320, 1322 (Me.1981), because of our view that such tests have a "non-existent value" when it comes to determining credibility. *Heselton v. Wilder*, 496 A.2d 1063, 1066 (Me.1985) (*quoting State v. Mottram*, 158 Me. 325, 330, 184 A.2d 225, 228 (1962)). Nevertheless, we have refused to adopt any per se rule "requiring a mistrial for *any reference* by a witness to the fact that he or she has taken such a test." *State v. Edwards*, 412 A.2d 983, 984 (Me.1980) (emphasis supplied). Instead, we have stated that if the reference to a polygraph is inadvertent, "there is cause for a mistrial if, but only if, the reference to the test raises an inference about the result that substantially prejudices the defendant's case." *Id.* at 985 (citations omitted).

In reviewing denials of mistrials, we review solely for abuse of discretion because of the trial court's "superior vantage point in assessing the impact of objectionable testimony." *State v. Jones*, 523 A.2d 579, 581 (Me.1987). Such an abuse occurs "only where there is a reasonable possibility that the objectionable evidence might have been a contributing factor productive of a guilty verdict." *State v. Hilton*, 431 A.2d 1296, 1302 (Me.1981). We have stated repeatedly that:

> The trial court should deny a motion for mistrial except in the rare case when the trial cannot proceed to a fair result and no remedy short of a new trial will satisfy the interests of justice. The determination by the trial court of whether the exposure to potentially prejudicial extraneous evidence incurably tainted the ver-

dict of the jury stands unless clearly erroneous.

*State v. Mason*, 528 A.2d 1259, 1260 (Me. 1987); *accord, State v. Allard*, 557 A.2d 960 (Me.1989); *State v. Baker*, 423 A.2d 227, 231 (Me.1980). These are strong words and we see no reason to step back from them when considering references to a possible polygraph test.

■ Applying the analysis of our case law, we first observe in accordance with *Edwards* that the polygraph inference here was unintentional: the testimony at trial concerning a test was a surprise to everyone. Second, under *Edwards* the evidence raises no inference about possible test results: there was absolutely no reference to test results or unwillingness to take the test or even faltering by Harnish when asked to take a test. Instead, the gist of the testimony was simply that Harnish was upset because the murder investigation had focused on him:

Q. Did he say why he was upset?

A. They were trying to say that—they wanted him to take a lie detector test.

Third, considering substantial prejudice under *Edwards*, we observe that this was the one and only reference to the subject during the course of four days of testimony by 37 witnesses. No curative instruction was ever requested. In response to the mistrial motion, the trial court made the discretionary judgment—after reviewing all the evidence with the opportunity that we lack to observe the witness and the jury—that "the reference to the polygraph test was not prejudicial to the defendant." Given the circumstances, we have no basis to reject this finding as clearly erroneous, *State v. Mason, supra,* and to assert that the trial court had to find the contrary possibility "reasonable." *State v. Hilton, supra.*

### Exclusion of Evidence of Another Threat

■ Harnish's neighbor Kathleen Walton testified on voir dire outside the presence of the jury. She stated that she heard

Desjardins and an unidentified individual talking in loud voices on the street at approximately 4:00 P.M. on the afternoon of the murder. She heard the unidentified individual say twice that he would kill Desjardins. After the conversation ended she heard two car doors slam. Because her shades were drawn she did not see the individual and she did not recognize his voice. The trial court excluded the evidence under M.R.Evid. 403.

Although we have recognized that "[i]n appropriate circumstances, a defendant should be allowed to introduce evidence to show that another person committed the crime," we have at the same time recognized that "[t]he trial court also has discretion to exclude such evidence if it is too speculative or conjectural or too disconnected from the facts of the case against the defendant." *State v. LeClair*, 425 A.2d 182, 187 (Me.1981); *State v. Conlogue*, 474 A.2d 167, 172 (Me.1984); *State v. Caulk*, 543 A.2d 1366, 1371 (Me.1988).[2] Here the trial court was confronted with only the vague testimony that an unidentified individual had publicly threatened to kill Desjardins the afternoon of the murder. There was absolutely no evidence to connect this threat to the murder later that evening, and no evidence suggesting that a third party was involved in the murder. We find no abuse of discretion in the trial court's decision to exclude the evidence under M.R.Evid. 403.

### Prosecution's Closing Argument

■ Harnish argues that he was entitled to a mistrial because of the following separate statements by the prosecutor in closing argument:

Mr. Harnish did not tell you the truth. Aside from that, how does Mr. Harnish react when he's questioned about this homicide? I suggest that he reacted with lies.

Now, talking about the false statements that Mr. Harnish made.

And Mr. Harnish acknowledged that that was not true. Why did he lie about not having been to Orono that day when he at first went through his activities on Saturday?

What other kind of misstatements did Mr. Harnish make? Well, he made misstatements or lies about the time.

—Mr. Harnish ... lied about Pat Almenas in that statement, again, which Mr. Harnish made in Springfield.

What else did Mr. Harnish not tell the truth about? He didn't tell the truth about the amount of the debt that he owed Fred Desjardins.

Do you know that old saying, oh what a tangled web we weave when at first we practice to deceive.

We review the trial court's decision to deny the motion for mistrial only for an abuse of discretion. *State v. Mason*, 528 A.2d 1259, 1260 (Me.1987). It is true that the Maine Bar Rules provide that a lawyer is not to assert his or her personal opinion as to the credibility of a witness, M.Bar R. 3.7(e)(2)(v). We have recognized that Rule repeatedly. *See State v. Pendexter*, 495 A.2d 1241 (Me.1985); *State v. Smith*, 456 A.2d 16, 17 (Me.1983); *State v. Reilly*, 446 A.2d 1125, 1128–29 (Me.1982). The Bar Rule, however, also permits a lawyer to "argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated therein ...," M.Bar R. 3.7(e)(2)(v), and we have accordingly permitted references to the credibility of a defendant or a witness where the comment is fairly based on the facts in evidence, *e.g.*, *State v. Johnson*, 472 A.2d 1367, 1373–74 (Me.1984), such as an admission by the witness on the stand that he had lied. *State v. Pendexter*, 495 A.2d 1241 (1985).

In this case, when the prosecutor argued that Harnish had lied or reacted with lies, he was referring to points on which Harnish had grudgingly acknowledged on cross-examination that he had not told the

---

**2.** We have found an abuse of discretion in excluding a retracted confession by another individual. *State v. Conlogue*, 474 A.2d 167, 173 (Me.1984). We have found no abuse of discretion in excluding simply an allegation that a victim used drugs and carried a gun without any specific exculpatory references to other individuals who might have had the motive, intent or occasion to carry out the crime. *State v. Caulk*, 543 A.2d 1366, 1371 (Me.1988).

truth. Thus, the argument was based on facts in evidence. When the prosecutor argued that Harnish had not told the truth (about visiting Desjardins's house), he was really doing nothing more than stating the principal factual issue before the jury. In context, the prosecutor was not asking the jury to accept his judgment on credibility. Finally, although Harnish's lawyer sought a mistrial, he did not seek the less drastic remedy of a curative instruction, a remedy that was available. We are unable to conclude that the trial court abused its discretion in denying the motion for mistrial.

■ We likewise find no error in the trial court's refusal to grant a mistrial for the prosecution's use of the term "execution" in referring to the murder. There was testimony that Harnish himself had told acquaintances that the murder must have been the work of a "hit man."

### Assistance of Counsel

■ On his motion for a new trial properly filed within 10 days of the verdict, see M.R.Crim.P. 33, Harnish received an evidentiary hearing directed at the effective assistance of his trial lawyers. The witnesses included Harnish and his principal trial lawyer, and the trial court had the opportunity to confront the issues. We can therefore review the claim directly. *See State v. Gagne*, 554 A.2d 795, 796 (Me. 1989); *Kimball v. State*, 490 A.2d 653, 658 (Me.1985). Applying the two-pronged standard of *Lang v. Murch*, 438 A.2d 914, 915 (Me.1981) (first, whether there has been "serious incompetency, inefficiency, or inattention of counsel—performance by counsel which falls measurably below that which might be expected from an ordinary fallible attorney" and second, whether any such "ineffective representation by counsel likely deprived the defendant of an otherwise available substantial ground of defense"), we conclude from our review of the record that the trial court was not clearly erroneous, *True v. State*, 457 A.2d

793, 795 (Me.1983), in finding no serious incompetence, inefficiency or inattention. Instead, we find only legitimate tactical decisions made by able trial counsel to which we accord great deference. *Kimball v. State*, 490 A.2d 653, 657 (Me.1985).[3]

### Miscellaneous Matters

■ Neither the court's delay in responding to the jury's request for a readback of certain testimony nor an incorrect readback that was promptly corrected deprived Harnish of the constitutional right to a fair trial.

■ Finally there was abundant evidence for the jury rationally to find beyond a reasonable doubt every element of the offense charged. *State v. Barry*, 495 A.2d 825, 826 (Me.1985).

The entry is:

Judgment affirmed.

McKUSICK, C.J., and ROBERTS and COLLINS, JJ., concurring.

WATHEN, Justice, with whom Glassman and Clifford, JJ., join dissenting

I respectfully dissent from the Court's opinion. I conclude that defendant was prejudiced by the improper admission of evidence of his reaction to a request that he take a lie detector test. In order to affirm the conviction, the Court finds that there is *no reasonable possibility* that the improperly admitted evidence *might* have been a contributing factor productive of the guilty verdict. It is obvious to me, that the credibility of a homicide defendant is seriously affected by the revelation that he faltered when he was asked to take a lie detector test.

The Court reaches its conclusion by focusing on factors that are irrelevant to an analysis of prejudice. After describing our past precedent in general and concluding that the evidence was improperly admitted, the Court finds no abuse of discretion in

---

**3.** In the one instance that does not fit this statement—failure to challenge a juror—the trial court was entitled to believe the lawyer's testimony that he did not learn until after the trial that the juror had been involved in an altercation with Harnish and a friend ten to fifteen years earlier.

the denial of a mistrial because: (1) the testimony at trial was a surprise to everyone; (2) there was no reference to test results or any unwillingness on the part of defendant to take a test and (3) only one reference was made to the lie detector test. First, I fail to understand why it is important that the testimony was not explicitly called for by the prosecutor's question and was therefore a surprise. We are not considering the culpability of the prosecutor, but rather the fairness of defendant's trial. The impact of unfair and prejudicial testimony, is not diminished in any way by the fact that it comes as a surprise to the presiding justice and the attorneys. Similarly, it seems equally beside the point that there was no reference to test results. Our past opinions deal with evidence of a defendant's unwillingness to take a test, and we have declared that both "the results of a polygraph test *and* a party's willingness or unwillingness to take such a test are inadmissible." *State v. Trafton*, 425 A.2d 1320, 1322 (Me.1981) (emphasis added). Certainly, the objectionable evidence in this case permits the jury to infer that defendant was unwilling to take the test. The State argues that because the witness testified only that defendant was "upset", no evidence of defendant's unwillingness to submit to a lie detector test was put before the jury. The Court accepts the State's argument and defines the "gist" of the testimony in a stilted manner. I decline to draw such hypertechnical semantic distinctions in considering the inferences that could reasonably be drawn from the improperly admitted evidence. However the witness may have described the defendant's reaction, whether upset, distressed or nervous, I am confident that the jury concluded that defendant was reluctant to have his veracity tested.

Despite the rationale offered by the Court, this case implicates our prior holdings that a jury is unable to assess such evidence "without assuming a non-existent value for lie detector tests in general." *Heselton v. Wilder*, 496 A.2d 1063 (Me. 1985) (*quoting State v. Mottram*, 158 Me. 325, 330, 184 A.2d 225, 228 (1962). Because the improperly admitted evidence is

crucial to a determination of defendant's credibility and because his credibility is the vital issue in this case, I am forced to conclude that his trial was unfairly compromised by the reception of that evidence. Even though defendant's reaction to the request to take a lie detector test was mentioned only once, there is more than a reasonable possibility that the improperly admitted evidence might have contributed to the guilty verdict. I would vacate the conviction and remand for a new trial.